**UNITED STATES of America**

**v.**

**Victor Manuel GERENA, et al.**

**Crim. No. H–85–50.**

United States District Court,
D. Connecticut.

July 7, 1988.

Albert E. Dabrowski, Carmen E. Van Kirk, John A. Danaher, III, Leonard C. Boyle, Asst. U.S. Attys., Stanley A. Twardy, Jr., U.S. Atty., David D. Buvinger, William J. Corcoran, Trial Attys., U.S. Dept. of Justice, Hartford, Conn., for U.S.

Juan R. Acevedo, Hartford, Conn., for Norman Ramirez Talavera.

James L. Sultan, Rankin & Sultan, Boston, Mass., for Ivonne Melendez Carrion.

Diane Polan, Levine, Polan & Curry, New Haven, Conn., for Elias Castro Ramos.

James Bergenn, Shipman & Goodwin, Hartford, Conn., for Carlos Ayes–Suarez.

Richard Reeve, Asst. Federal Public Defender, New Haven, Conn., for Isaac Camacho–Negron.

Linda Backiel, Hartford, Conn., for Antonio Camacho–Negron.

Leonard I. Weinglass, New York City, for Juan Segarra–Palmer.

Richard J. Harvey, Hartford, Conn., for Filiberto Ojeda–Rios.

Margaret P. Levy, Hartford, Conn., for Angel Diaz Ruiz.

Michael Deutsch, Chicago, Ill., for Orlando Gonzalez–Claudio.

John Williams, Williams & Wise, New Haven, Conn., for Hilton Fernandez–Diamante.

Ronald L. Kuby, New York City, for Luis Colon Osorio.

Roberto Jose Maldonado, New Haven, Conn., pro se.

F. Mac Buckley, Buckley & Santos, Hartford, Conn., for Paul Weinberg.

Jacob Wieselman, Blume & Elbaum, Hartford, Conn., for Luz Berrios–Berrios.

Harold Meyerson, New York City, for Jorge Farinacci–Garcia.

RULING ON THE DEFENDANTS' MOTION TO SUPPRESS TAPE RECORDED EVIDENCE FOR VIOLATION OF 18 U.S.C. SEC. 2518(8)(a)

CLARIE, Senior District Judge.

The defendants have moved to suppress the 1,011 sealed electronic surveillance tapes which are in Spanish and made in Puerto Rico pursuant to orders issued and supervised by Chief Judge Perez–Gimenez during the period of April 27, 1984 through August 23, 1985. The defendants' motion to suppress is based on the alleged failure of the government to seal the tapes in a timely manner. The Court has heard testimony from twenty F.B.I. monitoring agents, F.B.I. agents involved in presenting the tapes for judicial sealing, the electronic surveillance clerk who maintained custody of the tapes after interception, attorneys within the Department of Justice who supervised the Title III investigation, as well as defense and government experts in the field of tape authenticity. Both the defendants and the government have filed lengthy, comprehensive briefs on the issue of sealing. Based on all the information, the motion to suppress the tapes is granted in part and denied in part. The Court suppresses, on the basis of time alone, all Levittown tapes and those Vega Baja telephone tapes made pursuant to the January 18, 1985 order; the motion to suppress all other tapes is denied. The basis for the Court's ruling is set forth below.

## FACTS

The defendants in this case have moved the Court to suppress the one thousand and eleven (1,011) electronic surveillance tapes generated in Puerto Rico in connection with the F.B.I.'s investigation of an alleged terrorist group which calls itself Los Macheteros.[1] The investigation commenced as the result of a Light Anti-Tank Weapon (LAW) Rocket Attack on the F.B.I. Office in the Federal Building in Hato Rey, Puerto Rico on October 30, 1983.

In connection with this case, the F.B.I. commenced electronic surveillance on April 27, 1984 and continued that surveillance at various locations until August 30, 1985. Two attorneys within the Department of Justice, Trial Attorney Frank Bove and Assistant United States Attorney Roberto Moreno acted as Title III supervising attorneys. The Chief Judge of the Federal Court for the Commonwealth of Puerto Rico, Judge Perez–Gimenez, was the authorizing judge for all the electronic surveillance that was conducted in Puerto Rico. In addition, Judge Perez–Gimenez reviewed all Title III progress reports submitted and sealed all tapes generated in the course of the investigation. Sixty-four Spanish speaking agents, from various parts of the United States, were temporarily assigned to Puerto Rico as electronic surveillance monitors during this period.

During the course of this electronic surveillance, the F.B.I. uncovered evidence which implicated Los Macheteros in the $7.2 million robbery of a Wells Fargo Depot in West Hartford, Connecticut on September 12, 1983. Pursuant to an indictment handed down by a Hartford Grand Jury in connection with ths $7.2 million dollar robbery, eleven defendants were arrested in Puerto Rico on August 30, 1985. The electronic surveillance terminated on August 30, 1985 as a result of the arrests and attendant searches. Also on August 30, 1985, one defendant was arrested in Dallas, Texas and another defendant arrested in Cuernavaca, Mexico by Mexican authorities. Based on a superseding indictment handed down by a New Haven Grand Jury, three additional defendants were arrested on March 21, 1986.

The first electronic surveillance order, an April 27, 1984 order, authorized the F.B.I. to intercept conversations at the Second

---

**1.** In the course of the electronic surveillance in Puerto Rico, the government generated 1,011 tape recordings. The government has reserved the right to introduce 166 recordings in its case-in-chief. The 166 so-called relevant tape recordings are from the surveillance at the following locations: Datsun Sentra, Levittown, Taft Street, El Cortijo, Vega Baja, and the El Centro condominium. Although the government also had authorization to conduct surveillance at the following locations: Paseo Arce residence, a farmhouse in Vega Baja, a 1980 Jeep Cherokee, a 1982 Jeep Suzuki, and a 1980 Datsun Hatchback, surveillance devices were never installed.

Floor Apartment # 3384, Levittown Boulevard, Levittown Puerto Rico and at three pay telephones [ (809) 795–9908, 795–9909, 784–9625] across from the Levittown apartment. Pen registers were also employed in the course of monitoring the public telephones. The Levittown apartment was identified in the affidavit filed by Special Agent Jose Rodriquez, in support of the order, as the apartment of the defendant, Filiberto Ojeda–Rios. The F.B.I. was authorized to intercept conversations which concerned violations of Sections 2384 (seditious conspiracy), 1951 (interference with commerce by threats or violence), 844(f) and (i) (destruction of government property and malicious destruction of property used in interstate or foreign commerce), and 371 (conspiracy to commit an offense or defraud the United States) of Title 18, United States Code.[2] The government sought and received two extensions to intercept conversations at the Levittown apartment and the three pay telephones. The final order expired on July 23, 1984. In fact, however, the F.B.I. ceased monitoring on July 9, 1984.

On May 11, 1984, the government sought and received authorization to intercept conversations from a 1982 Datsun Sentra Stationwagon, Puerto Rico License No. 20B892, registered in the name of Jose Rodriquez Perez, an alias for the defendant, Filiberto Ojeda–Rios. The F.B.I. sought and received four extensions to intercept conversations in the Datsun Sentra.

On July 27, 1984, the government sought and received authorization to intercept oral communications by microphone at the Taft Street apartment in Santurce, Puerto Rico and wire communications at the Taft Street residence telephone (809) 725–1629. In addition, the government sought and received authorization to intercept wire and oral communications at Calle 2, # B–2, El Cortijo, Bayamon, Puerto Rico, (809) 799–4524. Pen registers were employed at both locations in connection with the telephone interception. The Taft Street apartment was the residence of two defendants in this

case, Juan Segarra–Palmer and Luz Berrios–Berrios. At this point in the investigation, El Cortijo was the residence of the defendants, Filiberto Ojeda–Rios and Luis Colon–Osorio. One extension was sought and granted for continued oral surveillance at El Cortijo and Taft Street as well as wire surveillance at El Cortijo. No extension was sought to continue wire surveillance of the Taft Street residence telephone. The equipment to intercept oral communications was never installed at either El Cortijo or Taft Street because the F.B.I. could not gain entry to the residences despite continued efforts.

On November 1, 1984, Judge Perez–Gimenez authorized the F.B.I. to intercept oral communications at Calle 14, Vega Baja, Puerto Rico, the changed residence of the defendants Segarra–Palmer and Berrios–Berrios. Six extensions were authorized at the Vega Baja residence. On January 18, 1985, the F.B.I. received authorization to intercept wire communications at two public telephones near the Vega Baja residence [ (809) 855–9943, 858–9639]. Pen registers were used in the course of the Vega Baja telephone surveillance. A new order was authorized on March 1, 1985 and two extensions to continue the wire surveillance were thereafter granted. The final extensions for both the residence and the pay telephones expired on May 30, 1985.

The last electronic surveillance order authorized the F.B.I. to intercept oral communications at the El Centro Condominium, Building One, Suite 249, Hato Rey, Puerto Rico. The initial thirty day order expired on July 26, 1985 and two extensions were thereafter issued. Although the final extension expired on September 22, 1985, in fact, the wiretap terminated on August 30, 1985 "due to the execution of a search warrant on the location." (El Centro progress report ten (10), Dated September 4, 1985).

The F.B.I. used Revox A700 and B77 reel-to-reel tape recorders at the various

2. The F.B.I. was authorized at all locations to intercept conversations which concerned these

crimes.

monitoring sites. One recorder was designated an original recorder and one recorder a duplicate original. The machines were set up so that signal was sent independently into each recorder and two simultaneous recordings were produced. One recording was designated the original and the other recording the duplicate original. Where conversations were being monitored and it appeared that the reel-to-reel tapes were about to run out, the agents were instructed, fifteen minutes before the tapes ran out, to fast forward the duplicate original reel, remove it from the recorder, and place a new tape on the duplicate original machine. This new tape would be deemed an original tape. Several minutes prior to the first tape running out, the agents were to begin recording on the continuation original tape. This would result in duplicative recordings for several minutes. (*See* written memorandum from Special Agent Calvin Sieg, G.X. # 375A).

However, this so-called Sieg procedure was orally modified and a simpler method was adopted over time to record conversations during the change of tapes. Sony superscope cassette recorders were used to record conversations sought to be intercepted during the change of the reel-to-reel tapes. The cassettes so generated are titled "A" Tapes. Fifty-five "A" Tapes were produced at Levittown.

Cassette recorders were used for two additional purposes during the Title III investigation. The Datsun Sentra surveillance was carried out using the Sony superscope cassette recorders. In addition, the F.B.I. monitors testified that cassette recorders were employed at the locations by many monitors to create a simultaneous cassette recording with the reel-to reels. This simultaneous cassette recording was used as a work cassette at the monitoring site to assist agents in maintaining accurate Title III logs of the conversations being intercepted. The use of cassette recorders to make work cassettes in Puerto Rico was first disclosed to both the Court and the defendants on September 1, 1987. Some work cassettes were retained by the F.B.I. and have been disclosed to the defendants. Other work cassettes were either reused by monitors or taken to the F.B.I. office and run through a bulk eraser. The defendants claim that the use of work cassettes, specifically, the failure to present the work cassettes for judicial sealing as original tapes, violated Title III. The Court rejects this argument. The tapes that concern the Court in regard to the Title III sealing requirement are those tapes designated in the course of the surveillance as original reel-to-reel tapes. The original reel-to-reel tapes are the evidence in this case.

In addition, the defendants have alleged other Title III violations, including allegations that the monitoring agents listened without recording. In regard to both the work cassette and listening without recording claims, the defendants have attacked the credibility of the monitoring agents. It is premature to address these allegations at this time; the claims are not relevant to the Court's determination of whether the government has violated 18 U.S.C. Sec. 2518(8)(a) and will be addressed in separate rulings.

The monitoring agents used chain of custody envelopes, FD 504 envelopes, for the original reel-to-reel tapes. The first monitor of the day would prepare the FD 504 with the case file number, reel number, court order number, location being monitored, and the monitoring agent's name. At the termination of a reel-to-reel, the monitoring agent on duty would place both the original tape and the overhear log, a written summary of the surveillance activities, into the FD 504 envelope. Either the monitoring agent or another special agent would deliver the FD 504 envelope to Roberto Salicrup, the electronic surveillance (ELSUR) clerk. If Salicrup was not available, the agent would drop the FD 504 envelope through a mail slot into the Electronic Surveillance Room (ELSUR room) in The F.B.I. Office in Hato Rey, Puerto Rico. The face of the 504 envelope would indicate the transfer from the various agents to either Salicrup or to the ELSUR room. Roberto Salicrup established a procedure to log in the original tapes received. After an original tape or an original cassette, in the

case of the Datsun Sentra, was administratively processed by Salicrup, that tape was placed in a locked metal filing cabinet.

The F.B.I. monitoring agents delivered the duplicate original tapes to translators/transcribers in the Hato Rey F.B.I. Office. Copies of the original overhear logs were made prior to delivering the originals to the ELSUR room and copies of the overhear logs were also brought to the translators/transcribers. In the case of the Datsun Sentra cassettes, the monitoring agents made high speed copies of the original Datsun Sentra cassettes prior to delivering the originals to the ELSUR room. These high speed copies were brought to the translators/transcribers for review.

The government has represented that it seeks to introduce 166 tapes generated from the electronic surveillance conducted in Puerto Rico in its case-in-chief. The tapes were created at the following locations: Levittown, the Datsun Sentra, Taft Street, El Cortijo, Vega Baja, and El Centro. At three specific points in the investigation, the tapes were judicially sealed. Four hundred and fifty-seven tapes from Levittown, Datsun Sentra, Taft Street, and El Cortijo were sealed on October 13, 1984. The Vega Baja tapes, four-hundred and sixty-seven in number, were sealed on June 15, 1985, and the eighty-eight El Centro tapes were judicially sealed on September 14, 1985. The defendants have challenged the timeliness of all three sealings under Title III, 18 U.S.C. Sec. 2518(8)(a).

## DISCUSSION OF LAW

### I. OVERVIEW

Title 18 U.S.C. Sec. 2518(8)(a) requires that

immediately upon the expiration of the period of the order [warrant] or extensions thereof, such recordings shall be made available to the judge issuing such order and sealed under his directions. The presence of the seal provided for by this subsection or a satisfactory explanation for the absence thereof, shall be a prerequisite for the use or disclosure of the contents of any wire or oral communication or evidence derived therefrom under subsection (3) of section 2517.

The statute is clear in requiring timely sealing as a prerequisite for the use or disclosure of the wire or oral communications intercepted. "A violation of the (post-interception) sealing requirement is to be controlled by the exclusionary command of the same statute which imposed the requirement in the first place." *United States v. Mora,* 821 F.2d 860, 866 (1st Cir. 1987). Thus, the exclusionary provisions under Secs. 2515 and 2518(10)(a) do not control in this area. *Accord United States v. Diana,* 605 F.2d 1307, 1312 (4th Cir. 1979), *cert. denied,* 444 U.S. 1102, 100 S.Ct. 1067, 62 L.Ed.2d 787 (1980).

This ruling focuses on that portion of the statute which, in essence, requires immediate sealing of the tapes, as a prerequisite for their use, upon the expiration of an order or extension thereof. "The legislative history to 18 U.S.C. Sec. 2518(8)(a) reveals that the sealing requirement contained therein was intended to insure the integrity of tapes after interception." "Delay in Sealing or Failure to Seal Tape or Wire Recording as Required by 18 U.S.C. Sec. 2518(8)(a) as Ground for Suppression of Such Recorded Evidence At Trial," 62 A.L.R.Fed. 636, 639 (1983). Several circuits have described the aim of the statute. "The post interception procedural requirements contained in 18 U.S.C. Sec. 2518(8)(a) aim to preserve the integrity of the intercepted conversations to prevent any tampering or editing of the tape or unlawful use." *Mora,* 821 F.2d at 867. *See United States v. Gigante,* 538 F.2d 502, 506 (2d Cir.1976); *United States v. Mendoza,* 574 F.2d 1373 (5th Cir.1978), *cert. denied,* 439 U.S. 988, 99 S.Ct. 584, 58 L.Ed.2d 661 (1978); *United States v. Lawson,* 545 F.2d 557 (7th Cir.1975).

■ The Court notes that despite the stated objectives, the statute does not require immediate sealing of recordings at the expiration of each thirty day order. For example, if the government sought and received continuous authority, by an initial order and subsequent extensions, to con-

duct electronic surveillance at the same location for a one year period, the sealing requirement would be triggered only at the expiration of the final thirty day period. Thus, the government would not be required to seal tapes generated pursuant to the initial order until twelve months later. *See United States v. Fury*, 554 F.2d 522, 533 (2d Cir.1977), *cert. denied*, 436 U.S. 931, 98 S.Ct. 2831, 56 L.Ed.2d 776 (1978) (there is some logic in the proposition that the purpose of the sealing requirement would be better served if the tapes were sealed every thirty days).

As a general rule, most circuits have held that the failure to adhere strictly to the immediacy requirement is not *ip so facto* grounds for suppression of all tapes derived from the electronic surveillance. Rather, courts have established a somewhat more flexible approach to the issue. As in the case of an absence of any sealing, a delayed sealing will prompt a court to ask for a satisfactory explanation. Various circuits have, however, taken a slightly different approach in their analysis of what constitutes a satisfactory explanation. For example, the seventh circuit set forth a standard in *United States v. Angelini*, 565 F.2d 469 (7th Cir.1977), *cert. denied*, 435 U.S. 923, 98 S.Ct. 1487, 55 L.Ed.2d 517 (1978). The seventh circuit looks initially to whether a satisfactory explanation for the delay exists. If an explanation is satisfactory, the tapes need not be suppressed. However, even if the court is not satisfied with the explanation, the tapes need not be suppressed provided that the purposes intended by Congress were fulfilled despite the delay.

▇ In *United States v. Massino*, 784 F.2d 153 (2d Cir.1986), the second circuit set forth a very explicit schedule which is to govern the sealing of tapes gathered through electronic interception. The schedule enunciated in *Massino*, however, applies to future cases and does not govern the electronic surveillance conducted in connection with this case. Thus, at the time that the electronic interceptions occurred in Puerto Rico in this case, the second circuit was not operating under the

schedule set forth in *Massino*. Rather, at the time of this investigation, the second circuit followed a procedure set forth in *United States v. Rodriquez*, 786 F.2d 472 (2d Cir.1986). Pursuant to *Rodriquez*, the court inquires as to whether a satisfactory explanation for the sealing delay has been proffered by the government. The determination of whether or not the government has offered a satisfactory explanation turns on several factors, including whether the tapes have been tampered with, whether the defendants have been prejudiced by the delay, the length of the delay, the diligence of law enforcement personnel in performing the necessary pre-presentment tasks, the foreseeability and urgency of circumstances diverting the attention and energies of those responsible for the presentation of the tapes to other matters, the amount of time needed to prepare the tapes for sealing, and whether there is any evidence of bad faith on the part of law enforcement agencies to evade the statutory sealing requirements. *Rodriquez*, 786 F.2d at 476.

▇ The first circuit in *Mora*, 821 F.2d at 867–869, set forth the standard it applies when faced with the issue of the government's failure to seal electronic surveillance tapes in a timely fashion. A court is directed under *Mora* to ask one question, "Is there a satisfactory explanation for the absence of timely judicial sealing?" Factors which are critical to the court's resolution are: 1) whether the government has proven by clear and convincing evidence that the integrity of the tapes has not been compromised, 2) whether the delay in presenting evidence for sealing came about in good faith, 3) what is the length of any particular delay, and 4) what is the cause of the delay.

This Court ruled on February 4, 1987 that the law of the first circuit controlled where a material difference exists between the sealing requirements in the first and second circuits. The February 4, 1987 ruling was based on the fact that all the electronic surveillance which is the subject of the present motion to suppress was conducted pursuant to orders issued within the

first circuit jurisdiction, and Title III relies heavily on local judicial supervision. Thus, where conflicts arise between the law of the circuit where the orders were issued and that where the motion to suppress is pending, the former prevails. As noted above, there is no material conflict between the law of the first circuit as expressed in *Mora*, and that of the second circuit, at the time the tapes in this investigation were sealed, as expressed in *Rodriquez*. In both cases, where the tapes were not sealed in a timely manner, the burden rests on the government to provide a satisfactory explanation for the delay. In both circuits, whether an explanation is deemed satisfactory turns on a variety of factors. Thus, the Court's findings in regard to the issue of timely sealing under the law of either circuit are the same.

■ The government intends to introduce surveillance tapes derived from electronic surveillance conducted at the following locations in Puerto Rico: Levittown Boulevard, Datsun Sentra, Taft Street, El Cortijo, Vega Baja, and the El Centro Condominium. In regard to all sealing dates except the Datsun Sentra, the Court has found that the tapes were not sealed "immediately" as the term has been defined. (see Appendix A) The parties disagree not only about whether the delays incurred were justified but also about how the delays are to be calculated. In the brief filed on June 13, 1988, the defendants miscalculated the thirty day period of an order as well as the actual sealing delays in this case. In computing the thirty day period, the day of authorization is not included. Thus, a thirty day order granted on June 23 expires on July 23. Secondly, as with a thirty day order, in calculating the length of a sealing delay, the date on which the authorization ends is not included. Thus, a delay of sixteen days is found where an order terminates on May 30 and the tapes are not sealed until June 15. *United States v. Badalamenti*, 794 F.2d 821 (2d

Cir.1986); *United States v. Rodriquez*, 612 F.Supp. 718, 726 (D.C.Conn.1985). The actual delays encountered in this case will be discussed below in greater detail. Initially, however, in light of the Court's finding that the government failed to comply with the immediacy requirement, the government has the burden to show by clear and convincing evidence that the tapes intended to be used by the government in its case-in-chief have not been altered.

## II. INTEGRITY OF THE TAPES

[5] *Introduction:* In *Mora*, the first circuit stated that it would look "first—and most searchingly—at whether the government has established ... that the integrity of the tapes has not been compromised." *Mora*, 821 F.2d at 867. Late-sealed tapes must be excluded at trial unless the court finds that the government has proven the integrity of the subject tapes [3] by clear and convincing evidence. *Id.*

[6] In line with the decision in *Mora*, the District of Columbia Circuit has "reject[ed] ... [the] suggestion that it is incumbent upon the potentially aggrieved person to present evidence constituting a colorable challenge to the integrity of the tapes." *United States v. Johnson*, 696 F.2d 115, 124–125 (D.C.Cir.1982); *see also Gigante*, 538 F.2d at 507. Accordingly, it is not the defendants' obligation "to prove affirmatively that tampering has occurred;" rather, the government must establish by clear and convincing proof that the subject tapes are "pristine." *Mora*, 821 F.2d at 868.

In *Mora*, *Johnson* and other late-sealing cases, in evaluating the integrity of late-sealed tapes, the courts divided their attention between (1) the chain of custody of the tapes; and (2) the physical integrity of the tapes. Accordingly, the Court's analysis of the integrity of the tapes is likewise bifurcated.

---

**3.** Because the Court has determined that the Datsun Sentra tapes were judicially sealed in a timely fashion and because the Court has suppressed the Levittown residence and payphone tapes due to the excessive delay in sealing, these tapes are not considered in the instant analysis of the integrity of the tapes. Moreover, the Court's review shall be limited to the evidence tapes, those tapes which the government has designated for possible use in its case-in-chief.

## A. CHAIN OF CUSTODY

Written procedures for handling of the Title III evidence were contained in the F.B.I.'s "MIOG" (Manual of Investigative Operations and Guidelines); in a memorandum by Special Agent Calvin Sieg ("Sieg memorandum"); and in the ELSUR (i.e. electronic surveillance) working guide. In addition to the written instructions, the monitoring agents were also given oral instructions as to the handling of Title III evidence in this case.

Chain of custody documentation was initiated at the beginning of each monitoring shift. At the start of the shift the agents filled out a F.B.I. form FD–504 envelope listing their name, the date and the time. On the leader of the tape itself, the agents wrote down the location, reel number, date, time and their initials. At the end of a shift or a reel, the monitoring agents rewound the tape, returned it to the original box and placed it inside the F.B.I. form FD–504 envelope, together with the written monitoring log. When a tape was completed in the middle of a shift, a new FD–504 envelope was started for the next tape.

As a general practice, the monitoring agents on a shift delivered the completed tapes to the F.B.I. office in Hato Rey, Puerto Rico and deposited the envelope through a mail slot into a locked, restricted access room (i.e. the ELSUR room). If a tape was still on the machine at the end of a shift, the monitoring agent signed the FD–504, releasing custody to the next shift monitor, who then signed the FD–504, accepting custody. Agents monitoring on the evening shift removed the tapes and delivered them to the ELSUR room at the end of their shift, usually around 11 p.m. However, because of the distance from the monitoring site to the F.B.I. office, second shift agents at the Levittown and Veja Baja monitoring sites left their tapes at the monitoring site in the custody of the security agent, a special agent of the F.B.I. whose duty it was to maintain the security of the monitoring post, the surveillance equipment and the tapes. In most instances, the security agents delivered those tapes to the ELSUR room the next morning.

Roberto Salicrup ("Salicrup") was employed by the F.B.I. as the electronic surveillance file assistant ("ELSUR clerk") in Hato Rey, Puerto Rico during the period of April 1984 through September 1985. He took three training courses in connection with his duties as an ELSUR clerk. As the ELSUR clerk, Salicrup had responsibility for maintaining custody of the electronic surveillance tapes and controlling access to the evidence room.

Roberto Salicrup maintained a controlled access room for the storage of electronic surveillance tapes in the F.B.I. office at Hato Rey, Puerto Rico. Entry to the ELSUR room was gained through a single door which was kept locked at all times. During the course of this investigation, a second ELSUR room was created and designated as Room No. 2, adjacent to the first room, but not accessible through a connecting door. The door to each ELSUR room had two locks. One locking mechanism was common to both doors, but the second lock on each door was different. When Salicrup was outside either ELSUR room, the doors always remained locked. Only five other people, Special Agent David Shrimp, Luis Berrios and Rita Olivo, as well as the Special Agent in Charge and the Assistant Special Agent in Charge, had access to the ELSUR room. Only Roberto Salicrup maintained a set of keys to the rooms. The second set of keys was kept in a safe in the office of the Special Agent in Charge. Individuals who entered and left the ELSUR room were required to sign the ELSUR log and state the reason why they were entering, the date and time they entered and the date and time that they left.

On a typical morning, it was Roberto Salicrup's responsibility to sign the entry log to the ELSUR room, to check and see if any tapes had been deposited through the mail slot on the door and to take custody of any such tapes. He assumed custody by signing his name on the FD–504 envelope. Salicrup then opened the FD–504 envelope to ensure that the tape was inside and properly labelled. Salicrup checked the FD–504 envelope to be certain that it had been properly completed and he compared

the label on the box to the label on the reel to make sure that they corresponded. He also checked the leader of the tape to determine whether there were any discrepancies. Once he had confirmed that all markings were correct, Salicrup sealed the FD–504 envelope with evidence tape and placed it in a special metal filing cabinet which was kept locked at all times with a bar-lock security device. Salicrup possessed the only key to this device.

If there were any discrepancies between a FD–504 envelope and the tape, or on the FD–504 envelope, Salicrup went to the agent responsible for the apparent irregularity to resolve any questions. It was Salicrup's duty to locate such agents, many of whom were regularly monitoring at off-site locations. Accordingly, Salicrup was unable to seal every tape the same day that he received it. Corrections were made to some FD–504 envelopes. There are no records of which FD–504 envelopes were corrected.

Salicrup had responsibilities outside of the ELSUR room and, therefore, he did not remain constantly in the ELSUR room while on duty. While outside of the ELSUR room, Salicrup had the equipment (i.e. block stamp and evidence sealing tape) and the opportunity to accept tapes from monitoring agents. In such instances, Salicrup would verify the information on the FD–504 envelope and tapes and would block stamp and seal these tapes and their accompanying documentation and deposit them through the slot in the ELSUR door.

When Salicrup discussed questions about tapes with an agent, he never left the tape with the agent. The tape remained in Salicrup's custody. Whenever Salicrup released custody of a tape he would ensure that the person accepting custody of the tape signed the FD–504 envelope to reflect that fact. It was around July 1, 1985, with the publication of the "ELSUR Working Guide", that Salicrup began making a notation on the FD–504 envelope of the purpose for which custody of a specific tape was transferred. Commencing at that same time, and in compliance with the newly received procedures in the ELSUR working guide, notation was made on the FD–504 chain-of-custody envelope of when, and for what purpose, the ELSUR clerk had occasion to access a tape held in the ELSUR safe. Salicrup never released custody of a tape that had been judicially sealed. It was Salicrup's practice to seal FD–504 envelopes with evidence tape and to initial and date that evidence tape. He would then complete an FD–192 form and staple it to the FD–504 envelope and take the entire package to a supervisor, who would initial the block stamp in the lower right hand corner of the FD–504 envelope and 192 form.

It was Salicrup's practice not to accept a tape more than five days after the date of interception, unless the agent delivering the tape had a written explanation for the delay. Such an explanation would also have to be given to the agent's supervisor and the supervisor would have to initial the agent's memorandum regarding the delay.

The date block-stamped on the documents reflects the date when Salicrup started processing the FD–504 envelope and 192 form. The dates on the 192 form and the FD–504 envelope, where Salicrup accepted custody, were not always the same because in some instances he prepared the 192 on the next day after he accepted custody. The date on the block stamp on the 192 form is the date that Salicrup prepared the 192 form. The typewritten material on the 192 form was pre-typed. The handwritten material on the form was entered on the date reflected in the block stamp. In a few instances, facial discrepancies exist between the dates on the FD–504 envelopes and the dates on the block stamp because Salicrup forgot to advance the date on the block stamp machine on a Monday, after the weekend. As a result, the block stamp would inaccurately reflect the date of the preceding Friday.

On a few occasions, Salicrup observed that some of the FD–504 envelopes were torn when placed through the mail slot in the door of the ELSUR room. "A couple of times", envelopes were badly torn, necessitating the re-making of the badly torn envelope. If there was only a small tear in

the FD–504 envelope, Salicrup placed evidence tape over the tear and initialled it.

Salicrup never opened a judicially sealed box, except under the supervision of Chief Judge Juan Perez Gimenez. He never released custody of a judicially sealed tape. If a special agent wanted to remove a tape from the ELSUR room prior to judicial sealing, Salicrup required the agent to produce authorization from the supervisor. Furthermore, the ELSUR log often contained notations regarding the movement of tapes, such as when they were taken from the ELSUR room to be copied. If a FD–504 envelope was opened after it had been sealed by Salicrup, such fact would be reflected upon the face of the FD–504 envelope, as there would be a second opening sealed by evidence tape, dated and initialled by Salicrup.

The agent delivering the FD–504 envelope made a photocopy of the monitoring log before turning in the original tape to the ELSUR clerk. The duplicate original reels were taken to the NAVMUR/NAGBOM room where the F.B.I. translators and transcribers worked. In the case of cassette tapes, the delivering agent made a high-speed copy before the original cassette was turned-in to the ELSUR room.

ELSUR clerk Salicrup participated in the judicial sealing by Chief Judge Juan Perez Gimenez of all the electronic surveillance tapes recorded in Puerto Rico in this case. Salicrup placed evidence tape on the banker's boxes housing the tapes and Chief Judge Perez Gimenez placed his initials and the date on the boxes which he sealed. Special Agents James Millen and Arthur Balizan travelled to San Juan, Puerto Rico and brought the sealed original tapes, secured in the banker's boxes, and which in turn were secured in wooden crates, to the United States District Court in Hartford, Connecticut, in whose secured custody the tapes have continuously remained.

When the crates, the banker's boxes and the 504 envelopes were inspected and unsealed in open court, all seals were found to be intact.

*Defendants' Particularized Claims:*

In their Post–Hearing Memorandum of Law and Proposed Findings of Fact, submitted in support of their motion to suppress electronic surveillance tapes, the defendants have set forth a litany of claims regarding the chain of custody of the tapes. The defendants assert that these claims demonstrate that the government has not discharged its burden of establishing the integrity of late sealed tapes. The Court has evaluated each of the defendants' chain of custody allegations in light of the applicable standards of law and all the evidence placed in the record during over six months of hearings on the instant motions. After careful review of all of the defendants' claims, the Court finds that they are without merit.

The defendants' individual claims are addressed specifically below:

1. Failure of government agents to deposit Levittown and Veja Baja tapes in the custody of the ELSUR room or custodian on the date they were intercepted.

 The defendants assert that because monitoring agents did not deliver many of the Levittown and Veja Baja tapes to the ELSUR room in the F.B.I. office in Hato Rey, Puerto Rico, after the completion of the evening monitoring shift ending at 11 p.m., there is no way of knowing whether the tapes were kept at the monitoring site overnight or if they were taken elsewhere and tampered with.

 The defendants' suspicions and idle speculation are unfounded. The FD–504 envelopes for the subject tapes clearly identify the agent who had custody of these tapes at all times prior to sealing. During the hearings on the instant motions, the defendants were afforded the opportunity to call and cross-examine those agents identified on the FD–504 envelopes as possessing the Vega Baja and Levittown tapes during the times in question. If, indeed, there was ever an occasion for tampering of the tapes, the defendants had ample opportunity to pursue this possibility in their examination of the custodial agents.

2. No log for Vega Baja residence tape # 130 was contained in the FD–504 en-

velope; no records were maintained by the F.B.I. documenting the custody of original logs; logs were removed from the ELSUR room in September, 1984 without explanation.

The defendants assert that that the above-stated allegations concerning the activity logs maintained by the monitoring agents somehow demonstrate deficiencies in the government's chain of custody of the tapes. Without first passing on the accuracy of these allegations, the Court emphasizes that its concern is with the chain of custody of the tapes, not the chain of custody of the logs. Second, the defendants are in error when they allege that the logs were taken from the ELSUR room in September, 1984. The evidence of record does not support such a claim.

3. Agents made non-contemporaneous entries on the FD–504 envelopes.

■ The defendants argue that ELSUR clerk Salicrup's practice of requesting monitoring agents to correct inaccuracies or fill-in portions left blank on the FD–504 envelopes constitutes "non-contemporaneous" entries which undermine the validity of these records. On the contrary, the Court finds that this practice served to heighten the reliability of these records rather than lessen it.

4. ELSUR clerk Roberto Salicrup recreated FD–504 envelopes.

■ The defendants posit that such an act makes all FD–504 envelopes suspect. It was the testimony of ELSUR clerk Salicrup that FD–504 envelopes would, occasionally, become torn when passed through the mail slot into the ELSUR room. In such instances, Salicrup would patch the tear with evidence tape if the hole was not too large. He would copy-over all information from the torn FD–504 envelope if the tear was beyond repair. As all information from the original FD–504 would be duplicated onto the new form, the accuracy of the chain of custody document was not compromised.

5. Tape leaders from two Vega Baja payphones were missing starting times in 80–90% of the cases.

The defendants ascribe no particular prejudice to this minor lapse in record keeping, nor can the Court discern any.

6. ELSUR clerk Salicrup failed to initial and/or date the evidence tape seals in certain instances.

■ Likewise, no particular prejudice is attributed to these isolated occurences. The Court finds that these rare and innocuous lapses in record keeping practices do not undermine the integrity of the chain of custody.

7. Unexplained discrepancies between various chain of custody documents.

The defendants claim that in some instances logs were blockstamped before FD–504 envelopes were received; that some evidence seals predate the receipt of the FD–504 envelopes by the ELSUR clerk; and that some FD–192 forms were block stamped several days after the date the FD–504 envelopes were received. The Court's examination of these claims reveals that they have no significance, but, to the extent that they are supported in fact, merely represent innocent instances of human error.

8. ELSUR clerk Salicrup backdated FD–192 forms.

The defendants allege that ELSUR clerk Salicrup deliberately and intentionally backdated FD–192 forms in an effort to fabricate a valid chain of custody. However, Salicrup's clear and unambiguous testimony does not permit so much as an inference that he intentionally backdated any chain of custody documents. Both his testimony and the evidence of record establish that any misdating of documents was a result of simple, innocent human error, such as Salicrup's failure to correctly set the date on the block stamp machine.

9. ELSUR clerk Salicrup received tapes when chain of custody documents show that he was not in the ELSUR room at the time.

The defendants claim that monitoring agents' entries on FD–504 envelopes reflect that they released custody of tapes to Salicrup at times when other records show that Salicrup was not in the ELSUR room. However, this claim ignores the simple fact

thàt Salicrup did not remain constantly in the ELSUR room and that Salicrup had the equipment and the opportunity to accept tapes when he was out of the ELSUR room. On such occasions Salicrup would blockstamp the documents, seal the FD–504 envelope and stick it through the ELSUR slot.

Moreover, monitoring agents testified that they had a practice of filling-out the FD–504 envelopes, including the "released custody" section of the form prior to leaving the listening post and actually delivering the tapes. In such instances, entries reflecting "released custody to ELSUR room" would result when these tapes were actually delivered to Salicrup when he was located outside of the ELSUR room.

10. Conflicts exist between entries on the FD–504 envelopes and the FD–192 forms regarding which agent released custody to the ELSUR room; conflicts exist between logs and FD–504 envelopes regarding who released custody of the tape to the ELSUR room.

The defendants assert that any such inconsistencies are evidence of falsification of the chain of custody. In making these claims, the defendants overlook the essential point which is that it is the FD–504 envelope which is the only true chain of custody document. Neither the FD–192 form nor the log have as their purpose the establishment of a chain of custody. Moreover, neither the FD–192 nor the logs are required to be created by those persons actually linked in the chain of custody. Accordingly, discrepancies between the chain of custody document, the FD–504 envelope (created by links in the chain of custody), and unrelated documents (created by others not necessarily in the chain), are of no significance.

11. Several tapes were not sealed by ELSUR clerk Salicrup within five days of interception; as a practice Salicrup took longer to seal "A" tapes.

■ The defendants allege that Salicrup did not comply with a F.B.I. internal policy requiring that evidence be secured within five days of receipt. (See GX 391, p. 46). Examination of the instant claim re-

veals that it lacks merit for at least three reasons: (1) even if the internal policy of the F.B.I. required that electronic surveillance evidence be secured within five days, an internal policy of the F.B.I. does not carry the force and effect of law and, accordingly, the failure to adhere to such a requirement does not warrant sanction by the court. (*See United States v. Falcone*, 364 F.Supp. 877, 894 (D.N.J.1973), *aff'd*, 505 F.2d 478 (3d Cir.1974), *cert. denied*, 420 U.S. 955, 95 S.Ct. 1339, 43 L.Ed.2d 432 (1975); (2) all but two nonrelevant tapes were sealed by Salicrup within five days; and (3) delays experienced by Salicrup were occasioned by innocent factors such as intervening weekends and the difficulty and delays attendant to securing accurate information from monitoring agents located at off-site listening posts.

12. ELSUR clerk Salicrup released tapes, which he had already secured, to agents prior to judicial sealing without notation on the FD–504 envelope of the reason why; a few FD–504 envelopes bear a second evidence tape seal indicating that they were re-opened.

■ The defendants argue that failure to document the purpose for accessing the tape on the face of the FD–504 envelope undermines the integrity of the chain of custody. However, the Court finds the defendants' argument lacking for the following reasons: (1) the essence of a valid chain of custody is the identification of the individuals who had possession of the tape and the date and time custody was transferred to another person. Knowledge of the purpose for which an individual obtained possession of a tape is not necessary to a proper chain of custody. Moreover, the defendants' argument to the contrary notwithstanding, notification on the FD–504 envelope of the purpose for which access to the tape was ostensibly gained would offer little protection against the large scale, wilfull tampering which the defendants have alleged occurred here. If one assumes that F.B.I. agents would access tapes for the purpose of tampering with them, one might also assume that the same agents would fabricate a legitimate reason for securing

the tape and note that fabrication on the FD–504 envelope; (2) the chain of custody documents and testimony elicited at hearing establish that the tapes never left the ELSUR room or the possession of the ELSUR clerk, and, hence, the chain of custody was maintained; and (3) many of the unexplained discrepancies cited by the defendants have in fact been satisfactorily explained. (These include the April 22, 1986, judicial unsealing of the tapes for duplication. In other instances, the reason for accessing the tapes was noted on the ELSUR log.)

*Analysis:*

An essential objective of Section 2518(8)(a) is to ensure that "[a]ppropriate procedures [be] developed to safeguard the integrity, and contents of the recordings to assure their admissibility in evidence." 1968 U.S.Code Cong. & Ad.News pp. 2112, 2193. *See United States v. DiMuro,* 540 F.2d 503, 512 N. 15 (1st Cir.), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1976). Accordingly, where judicial sealing of tapes has been other than immediate:

> [E]vidence from which the court can infer that the tapes were held in such a condition as to ensure that they could not be tampered with will be an important component of the Government's "satisfactory explanation."

*Johnson,* 696 F.2d at 125. (considering a similarly-worded local law analog of Section 2518(8)(a) and late judicial sealing of tapes).

In *Mora,* the first circuit found that the purposes of the sealing requirement had been satisfied, in significant part, because despite "the fact that the evidence was not seasonably presented for judicial sealing, the ... master recordings were kept under high security and in circumstances which betokened their continued integrity." *Mora,* 821 F.2d at 869. *Accord United States v. Vazquez,* 605 F.2d 1269, 1278 (2d Cir.1979) (all reasonable precautions against tampering should be taken both before and after judicial sealing is accomplished.)

▆▆ Therefore, the Court is concerned with whether the chain of custody practices and procedures employed by the F.B.I. in this case were sufficient to preserve the accuracy of recordings and deter alteration of those recordings pending a judicial order sealing the tapes. The testimony elicited during the extended hearings concerning the issue chain of custody establishes that the F.B.I. utilized procedures which reasonably assure that the tapes were not tampered with.

In adherence to these procedures, monitoring agents noted the target location, reel number, date and time that the tape was started and his or her initials directly on the leader of the tape. The agent simultaneously prepared a FD–504 chain of custody envelope for each new tape, inscribing on that FD–504 form his or her name and the date and time which the tape was placed on the recorder. At the completion of the tape reel, the monitoring agent rewound the tape, placed it in its original box with a label affixed to the box showing the location, reel number, date of interception and the monitoring agent's initials. The box and reel were then placed into the FD–504 chain-of-custody envelope and the FD–504 envelope was delivered to the custody of ELSUR clerk in the ELSUR room at the F.B.I. office in Hato Rey, Puerto Rico. The overwhelming majority of tapes were delivered to the custody of the ELSUR room, a doubled-locked, restricted access room in the F.B.I. office in a guarded building in Hato Rey, Puerto Rico, within 12 hours of their completion. Virtually all tapes were transferred to the custody of the ELSUR custodian within one day. The only exceptions were three non-relevant tapes which were delivered within two days, in one, related, incident.

Throughout this process, all original tapes remained in the custody of a F.B.I. agent whose name was recorded on the FD–504 envelope. Any change in the chain of custody was duly noted on the FD–504 envelope. The FD–504 envelope discloses the names of the agent releasing custody, the date and time custody was released and the name of the agent accepting custody as

well as the date and time custody was accepted.

In the recent case of *United States v. Angiulo*, 847 F.2d 956 (1st Cir.1988), the first circuit had occasion to examine the chain of custody of original electronic surveillance tapes which a district court had authorized be temporarily unsealed and released to the custody of the government, so that they might be transported to F.B.I. headquarters in Washington, D.C. for enhancement. During the time that these exclusive copy, original tapes were temporarily unsealed, they remained in the sole possession of special agents of the F.B.I.

On appeal of the denial of the defendants' motion to suppress the "judicially unsealed" tapes, the First Circuit held that:

> In cases involving unsealing of tapes, there would seem to be no less of a risk of frustrating the purposes underlying section 2518(8)(a)—the assurance of the accuracy and genuineness of tape recordings—than in situations where the government fails "immediately" to place the original tapes under seal.

*Id.*

Accordingly, the court required that the government prove that the unsealing and use of the tapes did not result in any alteration or tampering. The Court of Appeals determined that the government met its burden in *Angiulo*, relying upon its findings that: (1) "there was extensive examination and cross-examination of the agents involved in the custody ... of the tapes while unsealed"; (2) "the chain of custody was clearly established"; (3) "extensive security arrangements were employed at the F.B.I. headquarters ... where the tapes were kept"; and (4) the agents in possession of the tapes testified unequivocally that "there were no unauthorized persons with access to the tapes, no tampering, no deletions, and no additions." *Id.*

Here, as in *Angiulo*, there was "extensive examination and cross-examination of the agents involved in the custody of the tapes." During hearings which ran continuously from September 1, 1987, through May 5, 1988, the Court allowed direct and cross-examination of 20 agents of the F.B.I., selected by the defendants, who were involved in the creation and custody of the electronic surveillance tapes. These agents testified unequivocally about the extensive security arrangements which were employed in the chain of custody procedures, that there were no unauthorized persons with access to the tapes and that there was no tampering, deletions or additions to the tapes. (See preceding factual summary).

Applying the criteria articulated in *Angiulo*, this Court finds that the government has sustained its burden and has established by clear and convincing evidence that there was no tampering or alteration of the subject tapes.

### B. PHYSICAL INTEGRITY OF THE TAPES

#### 1. Originality of the Tapes:

The defendants' expert, Michael McDermott, opined that the 166 tapes which the government plans to offer into evidence are copies, not the original recordings. He has purported to base this conclusion upon a two-fold "finding:"

> (a) Test tapes made by a sampling of representative A700 and B77 Revox recorders showed that these machines left distinct erase head marks on the tape which were developable approximately 50% of the time through a process known as magnetic track development.
>
> (b) None of the 10 original sealed tapes and 47 duplicate originals that were made available to the defense contained a single developable erase head mark when tested by the same process.

According to Mr. McDermott, the sealed original recordings and corresponding duplicate originals had to be copies, since one would have expected to find developable erase head marks approximately 50% of the time if they were originals.

*Methodology of the Defendants' Expert:*

The individual offered by the defendants as a tape authenticity expert, Michael McDermott, acknowledged that his formal education bears no meaningful relationship to tape authenticity analysis. Moreover,

Mr. McDermott did not provide the Court with any documentary evidence that he ever received any training in the field of tape authenticity analysis and he failed to produce any evidence to support his claim that he received tape authenticity training from one Frederick Lundgren.

On several occasions Mr. McDermott went to the F.B.I. technical facility in Newington, Virginia in order to make test tapes on seven Revox model B77 recorders and five Revox model A700 recorders. As the F.B.I. did not keep a record of the serial numbers of the specific recorders actually employed in the subject electronic surveillance, Mr. McDermott was not able to ensure that the test tapes he created were made on the exact same machines which produced the tapes in issue. At Newington, the F.B.I. configured the equipment in a manner similar to its arrangement during the investigation. Mr. McDermott's purpose in making these test tapes was to obtain exemplars of how the record and erase heads would imprint the tape.

The defendants' expert then subjected the test tapes to a process known as magnetic track development. This procedure involves the application of a highly volatile solution, containing magnetic particles, directly to the audio tape. The particles are attracted to the magnetic patterns recorded on the tape. When the fluid evaporates a visible representation of the magnetic patterns is left on the tape. These representations are called magnetic marks. Mr. McDermott photographed marks with a magnifying (macro) lens. He then applied the same process to the 10 sealed original tapes and 47 duplicate original tapes. He claimed to have observed 100 areas on these tapes, photographing those areas of the tapes where, according to the logs, erase head marks should have appeared.

The three means by which one can determine whether a developed mark is an erase head mark are: (1) measure the distance from the suspected erase head mark to the record head mark which corresponds to it; (2) measure the height of the suspected erase head mark; and (3) measure the distance between the two vertical marks thought to be created by an erase head.

The distance from a record head to an erase head in a recorder should be measured through the use of waveform analysis, because of the curvature in the tape path from the record head to the erase head. This distance can also be measured through an overrecording technique. Mr. McDermott failed to employ either method. The Revox A700 record head to erase head distances are 2½ inches, with a variation of no more than .04 inches. The record head to erase head distance in Revox B77 recorders is 1.06 inches, with a variation of no more than .05 inches.

In order for a mark to be considered an erase head mark, the distance from a suspected erase head mark should accord with the distance from a record head to an erase head in an A700 or B77 recorder. However, with one exception, none of the marks identified by the defense in their exhibits DX 2593–2609, accord with the distances from record heads to erase heads in the appropriate recorders. In an effort to explain why his distance measurements are inconsistent with the distances from the record heads to the erase heads in the Revox recorders, Mr. McDermott asserted that his incongruous measurements were attributable to a "gate" theory which he was told of by Thomas Owen. This hypothesis, first mentioned by Mr. McDermott on redirect examination, attributes his inconsistencies in the distance measurements between record head marks and alleged erase head marks to a possible lack of synchronization between the record head "gate" and the erase head "gate."

The "gate" theory is fatally flawed in several respects and hence provides no explanation for Mr. McDermott's erroneous measurements. First, there are no "gates" in the Revox recorders. Indeed, Mr. McDermott was unable to point to the location of the "gates" on the Revox record head. In fact the term "gate" applies to digital circuitry, while the circuitry in the Revox recorders is analog circuitry. Second, there is a protective timing device in the Revox B77 recorder, insuring that the

signals to the record head and the erase head arrive simultaneously. Even were that timing device to fail, the resulting "contact bounce" would cause a deviation from the normal spacing between the record and erase heads of no more than .004 inches in the B77 recorder. There is no contact bounce in an A700 recorder and erase heads in an A700 are not implemented through a relay. Hence, the theory does not even apply to an A700 recorder. Third, the gate theory cannot explain why Mr. McDermott's *stop* mark measurements are inconsistent, as even Mr. McDermott admitted that these marks are placed on the tape *after* the tape comes to a stop.

Mr. McDermott's claim regarding the distance between the record and erase heads are further undermined by his failure to produce a single photograph depicting both the record head and alleged erase head marks, leaving it for the Court to take upon faith his representations that the "erase" head marks were located the appropriate distance from the record head marks. Moreover, the evidence establishes that the Court cannot trust the accuracy of Mr. McDermott's testimony regarding these distances. For example, Mr. McDermott testified in relation to DX 2596 that he measured 1 inch *from the record head* mark and that is the location where he found the erase head mark. In point of fact, the alleged erase head mark is located ½ inch from the record head mark.

Another indication of erase head marks is height. The record head marks are limited in size to the width of the record path, whereas erase head marks extend beyond the record track and are identifiable by virtue of this feature. Two acceptable means exist for determining the correct height of Revox record head and erase head marks. The height may be determined by reference to the manufacturer's specifications and may also be ascertained through the use of an overrecording technique. Although Mr. McDermott had never before examined Revox recorders, he neither physically measured the height of an erase head of either the A700 or B77,

nor did he ever seek to obtain this information from the manufacturer.

If a mark is developed on a recording tape, the fact that the interior tip of the mark is well-defined is inconsistent with a claim that the mark did not develop to its full height. While Mr. McDermott acknowledged that erase head marks should run to the edge of the tape, yet he admitted that none of the alleged erase head marks which he developed extended to the edge of the tape. Many of the photographs which Mr. McDermott made of these marks did not clearly depict the edges of the tapes, but, rather, were clouded in the residue of the magnetic track development fluid which he had applied too heavily. Testimony established that magnetic track development photographs can be taken without residue masking the edge of the tapes.

The third measurable feature of an erase head mark is the distance between the double spikes on the developed tape which reflects the distance that exists between the two vertical gaps in an erase head. In the operation of the recorder, these two vertical gaps do not move and the distances between them remains constant. The appropriate distance is determined by measuring the space between the two gaps on an actual erase head. Yet, Mr. McDermott never made such a measurement. The double gap distance in both the A700 and B77 erase heads is 2.7mm. Mr. McDermott erroneously claimed that there is a difference in the spacings between these two Revox recorder models. Mr. McDermott asserted that four of his November 1987 test tape photographs showed double spike marks from an erase head. However, none of the distance measurements made from those photographs are the same. Furthermore, only one of those double spike measurements corresponds with the double gap measurement of a Revox erase head.

*Methodology of the Government's Expert:*

The government offered Ernest Aschkenasy as their tape authenticity expert. Mr. Aschkenasy holds Bachelor's and Master's degrees in electrical engineering and is a nationally recognized expert in the field of tape authenticity analysis, having partici-

pated in the analysis of the Watergate tape recordings. Mr. Aschkenasy was assisted in his examination of the tapes and the preparation of his expert report by Mark R. Weiss, a highly trained tape authenticity expert who was one of the authors of the Watergate Tape Report.

As a tape authenticity expert, Mr. Aschkenasy performed an analysis of original tapes which included critical listening, magnetic track development, waveform analysis, spectrographic analysis and electronic tape scanning. Mr. Aschkenasy subjected the tapes to critical listening of the recorded material for any inconsistent sounds or qualities (e.g. gaps, clicks, fades or discontinuities). His waveform analysis involved reproducing the recorded sounds during playback as electrical signals which were then displayed as waveforms on an oscilloscope. These displays, called waveform prints, were used to identify the source of any signs suggestive of falsification. Spectrum analysis is a method of determining the frequencies of all components of the electrical signal, both micro and macro. Spectrum analysis was the basis for sensitive tests concerning the originality of the evidence tapes. Mr. Aschkenasy used spectrum analysis in this case to ascertain the number of "power hum" components on each tape (i.e. an original recording should display only one "power hum" component). Mr. Aschkenasy also employed a technique known as electronic tape scanning (E.T.S.) which permitted him to search out and identify erase head marks through waveform analysis. With E.T.S., through the use of four-track scanning technique, Mr. Aschkenasy was able to search all four audio tape tracks for the presence of erase head marks. Through electronic tape scanning, Mr. Aschkenasy was able to identify erase head marks through waveform analysis. In contrast, the waveform analysis employed by Mr. McDermott was deficient because Mr. McDermott used a standard half-track head which did not permit him to scan the area of the tape which is outside the record track (i.e. a half-track head is only 2mm wide, while an erase head mark can be as high as 2.8mm).

The E.T.S. technique employed by Mr. Aschkenasy is one which is recognized as proper by recognized experts in the field of tape authenticity analysis. The Court finds the defendants' criticisms of this technique and Mr. Aschkenasy's testimony concerning his application of this methodology to be without merit.

*Government's Expert's Findings:*

Based upon his analysis of the 10 sealed original tapes, as described above, Mr. Aschkenasy testified without reservation that nine of those tapes are original recordings. In particular, Mr. Aschkenasy testified that he found ample evidence of originality, through both spectrum analysis and electronic tape scanning, to convince him that these nine tapes were originals. Mr. Aschkenasy found that El Centro tape # 23 contained insufficient data to permit him to render an expert opinion as to that tape's originality. He also testified that there was insufficient data to permit a finding that El Centro tape # 23 is not an original. Such a conclusion is entirely consistent with Mr. Aschkenasy's prior testimony that, in his experience as a tape authenticity expert, there is often insufficient data to permit him to render an opinion on the authenticity of a tape, at least one-third of the time.

While initially unable to determine the means by which El Centro tape # 23 could have been created without the presence of an erase-off mark at the conclusion of the conversation on the tape, Mr. Aschkenasy subsequently determined that the "normal" switch on the SAMR (immediately adjacent to the main, "run/off/auto," switch) would, if thrown, result in the absence of an erase head off mark.

*The Court's Conclusions Regarding Originality Of The Tapes*

■ Having considered the expert testimony and reviewed the exhibits, the Court finds that the government has sustained its burden of proving the originality of the subject relevant tapes by clear and convincing evidence. The government presented cogent proof from a highly trained and experienced scientist who demonstrated, through his expert reports and testimony,

his competence and professionalism as a tape authenticity analyst.

Ernest Aschkenasy examined 10 sealed original and 32 duplicate original tapes. Based upon the results of a series of tests which included critical listening, magnetic track development, waveform analysis, spectrum analysis and electronic tape scanning, Mr. Aschkenasy demonstrated to the Court that nine of the ten sealed original tapes examined were original. In particular, the results of spectrum analysis testing and electronic tape scanning provided such clear indicia of originality that the Court was left with the abiding conviction that it was highly probable that these tapes are original. A tenth tape lacked sufficient data to permit Mr. Aschkenasy to establish by a reasonable degree of scientific certainty that it was either an original or a copy.

In an attempt to prove their claim that all 1011 tapes are copies, the defendants presented the testimony and report of Michael McDermott. However, neither Mr. McDermott nor his findings are credible. Mr. McDermott exaggerated the nature and extent of his training in tape authenticity analysis, created incomplete and misleading exhibits, gave erroneous testimony regarding critical measurements, failed to take important foundational measurements, displayed a surprising ignorance of relevant terms and audio equipment and had the temerity to give an "expert" opinion regarding tapes which he had never examined. Mr. Aschkenasy's analysis of all the markings which Mr. McDermott claimed were erase head marks demonstrated clearly that they were not erase head marks. In fact, erase head marks could not be found on either the sealed original or the duplicate original tapes because Revox recorders are designed not to leave such marks.

The Court's finding of originality is undermined neither by the fact that only 10 of the sealed original tapes were examined, nor by the inability to determine conclusively the originality of one of those ten tapes.

Neither the defendants nor their expert requested access to the actual evidence tapes, the sealed originals, until six weeks into the subject Title III hearings and eleven months from the time Mr. McDermott commenced his examination of the tapes in this case. Prior to this time, Mr. McDermott had expended 145 hours analyzing cassette copies of tape recordings and 732 hours examining approximately 250 duplicate original tapes. By motion dated October 16, 1987, the defendants requested that all original reel-to-reel recordings be made available to their expert witnesses Frank [4] and Michael McDermott. The defendants also moved that they be given sufficient funds and time to allow their experts to test all of the original reels.

The Court granted the defendants' motion in part, providing them with the opportunity to examine a sample of 10 original tapes. The ten tapes selected for examination were chosen by the defendants after their experts had reviewed both copies and duplicate originals of the tapes. Therefore, the defendants' selection of the ten tapes was an informed choice. Presumably, the defendants chose the ten tapes most difficult for the government to establish as original and free of tampering. Moreover, Mr. McDermott testified on redirect examination that the ten tapes were a representative sampling of the original tapes, sufficient for him to generalize with respect to the condition of all the other originals.

Furthermore, in light of the fact that a minimum of one-third of all tapes lack sufficient data for an expert to determine originality, coupled with the conclusion that a minor human error explains the absence of such data, the Court is convinced that the subject tapes are originals.

2. Allegations Of Tape Tampering:

In addition to the issue of originality, the second component of the Court's inquiry into the physical integrity of the tapes concerns the question of possible tampering or alteration of the tapes. "[F]reedom from adulteration is a necessary part of what the

---

**4.** Frank McDermott, founder of Frank McDermott, Ltd., assisted his son, Michael McDermott, in connection with his investigation of the tapes.

However, Frank McDermott was not called to testify concerning his work in this case.

prosecution must show...." *Mora,* 821 F.2d at 868. The defendants have alleged that their expert witness made findings on the issue of tampering regarding "undocumented starts and stops" on the tapes. They claim that these "findings" provide strong evidence that tapes may have been edited or altered. The defendants have asserted additional claims which they believe undermine the physical integrity of the tapes, including allegations that the tapes contain blanks and gaps; that the sealed original tape for Veja Baja telephone # 855–9943 # 40 was blank; and that there are conversations noted on the monitoring logs which do not appear on the tapes. It is noteworthy that the defendants have not claimed that a single conversation on the tapes has been altered or shows signs of tampering.

The Court has reviewed the defendants' claims of tampering, the testimony and reports of the parties' experts and the evidence of record and finds that the government has shown by clear and convincing evidence that there has been no tampering or editing of the subject tapes.

### a. *Defendants' Particularized Claims of Tampering*

1. Alleged Undocumented Stops And Starts:

 Mr. McDermott claimed that, employing the techniques of waveform analysis and critical listening, he discovered a total of 148 "undocumented stops and starts" in his review of 256 duplicate original tapes.[5] The defense has summarized the essence of their claim in the following terms:

> [T]he monitoring agents turned the recorder off and on without noting it on the log at least 148 times.

In turn, they have defined an "undocumented start and stop" as:

> [A] location on a tape where there is evidence the recorder was stopped and then started; there is no way to know how much time elapsed between the stop

and start. It is "undocumented" because no log entry exists for it.

While the defendants claim that "undocumented" starts and stops are evidence of editing, it is clear from the above statement of their claim and definition of their terms that the nature of the editing which they are alleging occurred is not the kind of editing which Congress was concerned about when it enacted the provisions of Title III which require that intercepts be accomplished "in such way as will protect the recording from *editing or other alterations."* 18 U.S.C. Section 2518(8)(a) (emphasis added.) Clearly, the form of editing which Congress sought to guard against was the editing of existing recordings, not "editing" what material would, or would not, be recorded on the tape.

The defendants charge that monitoring agents stopped and started the recorder without documenting that fact. The editing of which they complain is alleged to have occurred prior to, or during, the creation of the tapes. With its emphasis on protecting recordings from all forms of alteration, it is obvious that Congress was concerned with thwarting *post hoc* editing of tapes. "[T]he aim of the legislation is to ensure that the immaculacy of the *gathered* evidence remains unsullied." *Mora,* 821 F.2d at 867. (emphasis added.)

Therefore, the defendants' claim is not properly to be considered a claim of tampering or editing.

Moreover, the Court finds clear and convincing evidence in the record that the reasons for the existence of stop and start events on the tapes, to the extent that they exist, were innocent ones. The not infrequent, and often undocumented, phenomena of power surges and power outages; the accidental turning off or on, or both, of the recorders by monitoring agents; recorder reels sticking; physical damage to the tapes; and the loss of tape tension, all would cause the machines to shut off automatically and explain the presence of un-

---

**5.** In the expert report which Michael McDermott filed with the Court, he claimed to have identified a total of 365 undocumented stop and starts on the tapes which he examined. However, at hearing, McDermott testified that only 148 of the undocumented stop and starts were significant.

documented stops and starts. Indeed, the defendants' own expert witness, Mr. McDermott, testified that many undocumented stops and starts are attributable to innocent explanations.

Furthermore, Mr. McDermott's "findings" regarding alleged undocumented stops and starts are of questionable validity because they are based, not upon his examination of any of the sealed original tapes, but are instead the result of tests he performed on copies of the 10 sealed original tapes and 256 duplicate original tapes. The duplicate original tapes have been handled by numerous individuals since they were recorded. It is known that some have been damaged in the process. In light of this fact, Mr. McDermott's testimony that the fact alleged undocumented stops and starts appear on copies of three of ten original recordings permits him to generalize with respect to the condition of all original tapes is fatuous.

2. Conversations Alleged To Be On The Log But Not On The Tape:

[16] The defendants have alleged that there exist 28 instances where conversations are noted on the monitoring agents' logs but do not appear on the tapes. In setting forth this claim, they cite an alleged example and hypothesize that:

> Given that this is a tape that is missing two conversations that are summarized in the monitoring logs ("on log, not tape"), it is certainly possible that changes and additions were made to the monitoring log *after* the problem was discovered in an attempt to explain this anomaly. (emphasis added.)

Discounting the government's explanation that the equipment had malfunctioned (a fact which the monitoring agents had noted in the log), the defendants posited that:

> The more likely explanation, of course, is that the monitors were listening without recording and inadvertently took notes on the unrecorded part of the conversation.

As set forth in their brief, the entire substance of the defendants' complaint is: (1) that the monitoring agents listened without recording; and (2) that these agents doctored the logs, after the fact, if the agents had "inadvertently" taken notes on the unrecorded part of the conversation. However, the defendants' claim contains no allegation that the *tapes* were altered or tampered and, therefore, it is not properly before the Court in the instant motion.

In the present ruling, the Court is concerned with the physical integrity of the tapes. Through their "on log, not tape" claim, the defendants have neither alleged that the tapes themselves were tampered with or altered, nor have they presented the Court with any evidence suggestive of that claim. Accordingly, they have not stated a proper claim of tape tampering.

3. Vega Baja Telephone # 855–9943 Tape # 40:

[17] The sealed original reel-to-reel recording for Veja Baja Telephone # 855–9943 tape # 40 was found to be blank when, pursuant to Court order and under Court supervision, it was to be duplicated. The duplicate original of this tape is intact and this tape had been deemed relevant by the government and selected for use in its case-in-chief. The defendants allege that this occurrence presents evidence of tape tampering.

The Court finds that this singular occurrence is not evidence of government tampering. Before the blank tape was discovered, the government had made known its intention of using this relevant tape in its prosecution of the case. Under all the facts, it is not reasonable to conclude that this barren tape is proof of falsification or adulteration of the recording.

4. Additional Tape Anomalies Alleged By The Defendants:

[18] In their proposed factual findings, the defendants alleged over two dozen tape anomalies which they assert exhibit "suspicious characteristics[.]" Some of the tapes and claims cited by the defendants have already been discussed and ruled upon, *supra*, (i.e. Vega Baja Telephone # 855–9943 tape # 40; and Taft Street Telephone # 725–1629 tape # 7 and El Cortijo Telephone # 799–4524 tape # 1); the others need not be addressed as they concern

tapes which are non-relevant, have been suppressed or were determined to have been judicially sealed in a timely fashion. Nevertheless, a few observations by the Court are warranted.

The defendants have argued that the government, having been placed on notice of the defendants' claims, failed to have its expert examine all of the "inconsistencies and anomalies" regarding these particular tapes. It should be pointed-out, however, that the defense did not have their expert witness, Mr. McDermott, testify concerning most of these claims, either. Moreover, there was no "expert" report or testimony from the defendants' witness that was left unrebutted by the government's expert. The Court finds that, to the extent expert testimony would aid the Court in assessing the evidence, Mr. Aschkenasy provided sufficient expert testimony for the Court to make its findings.

Regarding the defendants' claims of gaps and breaks in the recordings[6], the testimony of both the defendants' witness and the government's expert convinces the Court that those gaps or breaks which exist in the recordings are attributable to the innocent occurrence of "signal dropout" (i.e. the loss of the record impulse) during the electronic surveillance.

In summary, the Court finds that the government has sustained its burden and established by clear and convincing evidence the physical integrity of the tapes.

## III. EXPLANATION FOR SEALING DELAYS: ADDITIONAL FACTORS

In this section of the ruling, the Court turns to additional factors beyond the issue of the tapes' integrity which the first and second circuits have recognized as integral elements in the determination of whether or not the government has provided a satisfactory explanation for the sealing delays. Although not an exclusive list, several key factors include: the length of the delay, prejudice to the defendants or benefit to

the government because of the delay (referred to as good faith in *Mora*), cause of the delay, and the diligence of law enforcement officials in presenting the tapes for judicial sealing. In the case at bar, Department of Justice Trial Attorney, Frank Bove, was responsible for sealing the Levittown, Datsun Sentra, Taft Street, and El Cortijo tapes on October 13, 1984 and the Vega Baja tapes on June 15, 1985. Frank Bove was a member of a group which became known as the Special Prosecution Unit in the United States Attorney's Office in Puerto Rico from April 3, 1984 through July 29, 1985. Although part of the Criminal Division within the Justice Department, the Unit worked with the United States Attorney's Office in Puerto Rico in investigating acts of terrorism and official corruption. Bove was assigned specifically to the terrorism investigation and was designated one of two supervising attorneys in the investigation of October 30, 1983 LAW rocket attack on the federal building in Hato Rey, Puerto Rico. Attorney Bove left the island on July 29, 1985. The other supervising attorney was Assistant United States Attorney, Roberto Moreno. Moreno was responsible for presenting the El Centro tapes for judicial sealing on September 14, 1985. Neither Bove nor Moreno had previous Title III experience prior to April 27, 1984, the date on which the government sought its first order to conduct electronic surveillance as part of this investigation.

### A. THE OCTOBER 13, 1984 SEALING

In regard to the October 13, 1984 sealing, Bove testified that he contacted federal judge, Perez–Gimenez, one week prior to the sealing and arranged with the judge to have the tapes sealed on October 11, 1984. Judge Perez–Gimenez came to the F.B.I. office in Hato Rey, Puerto Rico on October 11, 1984 and signed the order to seal the tapes. However, the physical sealing of the tapes did not actually occur until October 13, 1984. Bove testified that the judge was scheduled to meet with the Pope who

---

**6.** Although no allegation concerning "gaps" or "breaks" in the recordings was set forth with regard to those tapes properly on review by the Court in this ruling, because the list of tapes

cited by the defendants in their brief may not be an exhaustive list of their claims, the Court will entertain a general discussion of this claim.

was visiting in Puerto Rico during this period and did not seal the tapes on October 11, 1984. The Court and F.B.I. office were closed on October 12, 1984 due to the Pope's visit. The judge returned to the F.B.I. office on Saturday, June 13, 1985 to seal the tapes. Bove was not present at the F.B.I. office on October 13, 1984.

### 1. The Levittown Tapes

By its terms, the final extension to intercept oral communications at the Levittown apartment and wire communications at three public telephones near the apartment terminated on July 23, 1984. However, progress reports eleven (11) and twelve (12), submitted by Attorney Bove to Judge Perez–Gimenez, indicate that, in fact, the electronic surveillance terminated earlier. Bove reported in progress report eleven (11) that Filiberto Ojeda–Rios moved out of his apartment on July 3, 1984. In the course of his move, it came to the attention of the F.B.I. that the monitoring device may have been disconnected; however, the F.B.I. continued to monitor the residence until July 9, 1984. The F.B.I. also ceased monitoring the public telephones on July 9, 1984; no conversations had been intercepted at the public telephones after June 27, 1984. The monitoring equipment was not removed until July 26, 1984.

The application and order to seal the recordings generated at Levittown which included one-hundred and three (103) reel-to-reel recordings of oral communications, fifty-five (55) cassette recordings ("A" Tapes), and two-hundred and ninety-seven (297) reel-to-reel recordings of intercepted wire communications, was signed on October 11, 1984. The actual sealing of all the tapes occurred two days later on October 13, 1984 because of the Pope's visit. The Court will use the October 13, 1984 date as the date of the actual sealing.

As previously noted, the government is obligated under 18 U.S.C. Sec 2518(8)(a) to seal electronic surveillance tapes "immediately upon the expiration of the period of the order or extensions thereof ..." The government did not present the Levittown tapes for judicial sealing "immediately" as that term has been interpreted. For example, the second circuit has suggested that any presentation made more than two days after the end of the wiretap could not be considered immediate. *Vazquez,* 605 F.2d at 1278.

In determining the length of the delay in sealing the Levittown tapes, this Court initially asks when the final extension terminated. The monitoring device was not removed until July 26, 1984, three days after the extension, by a strict numerical calculation, terminated. However, all efforts to monitor the residence and public telephones ceased immediately after July 9, 1984 because the defendant, Filiberto Ojeda–Rios, moved out of the apartment. Moreover, the terms of the final Levittown extension authorized surveillance

until communications are intercepted which reveal the manner in which Filiberto Ojeda–Rios, Hilton Fernandez–Diamante, Jorge Farinacci–Garcia, Elias Castro–Ramos, Avelino Gonzalez–Claudio, Norberto Gonzalez–Claudio, an unknown male, a/k/a, Andres Leon Pagan, an unknown female, Ivonne Melendez–Carrion, Orlando Gonzalez–Claudio, Luz M. Berrios–Berrios, an unknown male a/k/a Jose Perez–Moreno, Isaac Camacho–Negron, and others yet unknown, are participating in the above described offenses and which reveal the identities of their confederates, their places of operation, and the nature of the conspiracy involved therein, or for a period of thirty (30) days from the date of this order, whichever is earlier.

Thus, the order to conduct surveillance is written in the alternative; surveillance is authorized for thirty days or until the objectives of the wiretap are achieved. Under the facts of the Levittown surveillance, the objectives, as far as possible, were achieved when the monitoring actually ceased and the location was abandoned by the Filiberto Ojeda–Rios.

The issue, whether the obligation to seal "immediately" at the "expiration of the period of an order or extensions thereof," under 18 U.S.C. Sec. 2518(8)(a) is triggered when the objectives are achieved or when the thirty day period runs, has not been

resolved. Appellate courts have recognized the dilemma without directly deciding it. The Badalamanti court affirmed the district court's determination of the length of the sealing delay. In fixing the delay at seven days, the district court used the date when the order terminated rather than when the actual interception ceased. Chief Judge Feinberg wrote,

> we believe that Judge Leisure properly found that the delay in this case began when the extension order expired, rather than when the interception actually ceased ... even under the appellant's analysis, the judge found that the objective of the surveillance had not been attained [when surveillance ceased]. Because the facts of this case do not require us to decide the difficult question whether sealing delays must be calculated from the expiration date of the order or from the date its objective is achieved, we decline to reach that issue which was left open in *United States v. Vazquez*, 605 F.2d at 1278 n. 21

*Badalamenti*, 794 F.2d at 824–825.

Similarly, the Mora court declined to reach the issue, stating

> [B]ecause the facts of this case overall do not require us to reach the problematic issue of whether delays ought to be calculated from the expiration date of the warrant or from such earlier date as the objective of the tape is achieved, we leave the issue for another day.

*Mora*, 821 F.2d at 863 n. 4.

■ Although recognizing the issue, this Court, too need not resolve it in regard to the Levittown sealing delay. The Court's ruling is the same whether one calculates the delay from July 9, 1984 or from July 23, 1984. Under the July 23, 1984 expiration date, the delay in sealing the tapes is eighty-two days; using the July 9, 1984 date as the expiration date, the delay is ninety-six days. In both cases, the Court finds the delay to be excessive as a matter of law and suppresses the Levittown tapes. As the court in *Mora* recognizes, at some point the length of delay may be "... so great as to require automatic exclusion of the evidence." The delay in this case is at least twice as long as that sanctioned in *Mora*, 821 F.2d at 870 and almost six times as long as the two week period which the second circuit has described as "among the longest it is willing to tolerate." *Rodriquez*, 786 F.2d at 478, *citing Massino*, 784 F.2d at 158.

The government cites *United States v. Vastola*, 670 F.Supp. 1244 (D.N.J.1987) and *Lawson*, 545 F.2d 557 for the proposition that this Court should sanction the Levittown delay as within the statutory bounds of Title III. In *Lawson*, the court denied the motion to suppress for failure to adhere to the statutory sealing requirement despite a fifty-seven day delay. "Fifty-seven days is not insignificant. We do not assign error to the failure to suppress the tape evidence on this ground because the appellants have not questioned the integrity of the tapes." *Id.* at 564. The Vastola court sanctioned, without much discussion, a four month sealing delay for the main reason that the "crucial factor ... is the integrity of the tapes themselves ... in the case at bar, the integrity of the tapes has not been challenged." *Vastola*, 670 F.Supp. at 1282.

That the third and seventh circuits sanction such lengthy delays where no challenge to the tapes' integrity has been made is consistent with the Court's earlier analysis of the varying approaches taken by the circuits when confronted with a late judicial sealing. The third, fifth, and seventh circuits have adopted an approach wherein courts are directed to address whether the congressional purpose behind the sealing requirement, i.e., maintaining the integrity of the tapes, has been met. The burden is on the defendants to prove that the tapes have been tampered with. These circuits are less concerned with the issue of the government's explanation for the delay than with the question of the tapes' integrity. *See United States v. Falcone*, 505 F.2d 478, 484 (3d Cir.1974), *cert. denied*, 420 U.S. 955, 95 S.Ct. 1339, 43 L.Ed.2d 432 (1975); *United States v. Diadone*, 558 F.2d 775, 780 (5th Cir.1977), *cert. denied*, 434 U.S. 1064, 98 S.Ct. 1239, 55 L.Ed.2d 765

(1978); *Angelini*, 565 F.2d 469; *Lawson* 545 F.2d at 564.

The approach taken by the first circuit and second circuit, at the time all tapes in this investigation were sealed, is somewhat different. A court is directed to ask whether or not the government has a satisfactory explanation for the delay. The integrity of the tapes is one factor, albeit a significant one, considered by the court in resolving the issue. The integrity of the tapes alone, however, is not dispositive. "... Standing alone, warranties of driven snow purity, proven beyond peradventure, will not suffice to constitute a satisfactory obligation." *Mora*, 821 F.2d at 868; *accord Rodriguez*, 786 F.2d at 477 (no evidence that tapes have been tampered with does not relieve the government of its burden to present a satisfactory explanation); *Johnson*, 696 F.2d 115.

The government also argues that the delay in sealing the Levittown tapes is not eighty-two or ninety-six days but rather seventeen.[7] This figure is arrived at by describing the El Cortijo wiretap, the tapes from which were sealed nineteen days after the expiration of the final order, as an extension of the Levittown. The Court rejects this argument. On February 25, 1987, in a ruling entitled, "Ruling on Defendant Luz M. Berrios Berrios' Regarding Violations of 18 U.S.C. 2517(5)," this Court noted that "the sole reason for the switch from the Levittown location to the El Cortijo location was that the individuals targeted in the Levittown residence moved to the new residence in El Cortijo ... [T]he El Cortijo surveillance was, in reality, genuinely an extension of the Levittown operation." *Id.* 19 n. 1. The government misinterprets the significance of this note. The Court's reference to "extension" in the February 25, 1987 ruling referred in a general sense to the expansion of the electronic surveillance investigation which com-

menced at Levittown. The note was not a finding by the Court that the El Cortijo wiretap was an extension as that term has been defined. "[T]he term extension as used in the phrase period of the order or extension thereof is to be understood in a common sense fashion as encompassing all consecutive continuations of a wiretap order, however designated, where the surveillance involves the same telephone, the same premises, the same crimes, and substantially the same persons." *Vazquez*, 605 F.2d at 1278.

Applying this definition to the facts, the El Cortijo order was not an extension of the Levittown electronic surveillance. The first extension for Levittown sought "continued authority ..." The initial application for surveillance at El Cortijo was not described as an application for continued surveillance. More importantly, El Cortijo is a completely different location than Levittown and the type of surveillance being conducted was also different. The F.B.I. was authorized at Levittown to intercept oral communications using a microphone at the Levittown apartment and wire communications at three public telephones; the El Cortijo surveillance was a tap of a private telephone. Based on the aforementioned definition, the Court finds that the El Cortijo wiretap was not an extension of Levittown, and the motion to suppress all reel-to-reel recordings and "A" Tapes generated from the surveillance at Levittown is granted.

### 2. The Datsun Sentra Tapes

The initial Datsun Sentra order was executed on May 11, 1984. Five extensions were subsequently authorized; the final extension terminated on October 10, 1984.[8] The process to seal the Datsun sentra cassettes commenced the following day but because of the Pope's visit, the actual sealing did not occur until October 13,

---

7. The government erroneously claimed that the El Cortijo tapes were sealed on October 11, 1984, and, therefore, calculated the sealing delay as seventeen rather than nineteen days.

8. The government sought an order to continue electronic surveillance of the Datsun Sentra on October 26, 1984; the government does not ar-

gue that this October 26, order, sought sixteen days after the expiration on October 10, 1984 of the September 10, 1984 final extension, was, itself, an extension. No communications were intercepted pursuant to the October 26, 1984 order.

1984. The three day delay in sealing was minimal and did not violate U.S.C. Sec. 2518(8)(a). The Court finds that the Datsun Sentra tapes were sealed "immediately" as that term has been defined. *See Rodriquez*, 786 F.2d at 476 (court recognizes a minimal two day delay satisfies the immediacy requirement).

A two day hiatus occurred between the expiration of the fourth and authorization of the fifth extension. The fourth extension terminated on Saturday, September 8, 1984 and an extension was granted on Monday, September 10, 1984. The Court finds that the sealing requirement was not triggered by the two day hiatus. This finding is based on a determination that: 1) the fifth extension was, in fact, an extension as the term has been defined, 2) the government has offered a reasonable, satisfactory explanation for the minimal delay, and 3). the sealing requirement is not triggered until the expiration of the order and all extensions thereof.

"The term extension, as used in the phrase, 'period of the order or extensions thereof' is to be understood in a common sense fashion as encompassing all consecutive continuations, of a wiretap order, however designated, where the surveillance involves the same telephone, the same premises, the same crimes and substantially the same persons." *Vazquez*, 605 F.2d at 1278. Applying this definition to the question at hand, the fifth order was clearly an extension of the fourth. The fifth order covered essentially the same targets, covered the same location, and concerned the same crimes. Second, the government has adequately explained the two day delay, which occurred over a week-end period. The absence of Stephen Trott, Associate Attorney General in Charge of the Criminal Division led to the two day hiatus. Attorney Trott, under whose authorization the applications in this Title III investigation were filed, was out of the country and unable to authorize the extension until Monday, September 10, 1984. *See Gigante*, 538 F.2d at 508 n. 11 (court remands to district court to determine if one order sought thirteen days after the termination of another order was an extension and, if so, whether the government had a satisfactory explanation for the delay): *United States v. Scafadi*, 564 F.2d 633, 641 (2d Cir.1977) (hiatus between order and extension does not trigger the sealing requirement).

Moreover, although the government has proffered a reasonable explanation for the two day hiatus, the Court questions whether an explanation is necessary in light of the fact that a two day delay in sealing the tapes would not itself violate the immediacy requirement. The government intended to seek the extension and did so immediately on Monday, September 10, 1984 when the Assistant Attorney General returned to the country and authorized the application for the extension.

Finally, the sealing requirement is implicated only at the termination of the period of the order or all extensions thereof. "Since the language of the statutes, the apparently prevailing practice and what case law there is supports the position that the government need not seal the tapes only after the termination of the extension of the original order, that is the position we adopt." *United States v. Fury*, 554 F.2d at 533. The sealing requirement is not triggered simply where the F.B.I. encounter problems in seeking an immediate renewal of an order or extension. Thus, the government was not obligated to present the tapes for judicial sealing until the expiration of the final extension on October 10, 1984.

The defendants argue that the delay in sealing the Datsun Sentra cassettes is seventy-one days. The basis for this claim is that no monitoring of the Datsun Sentra occurred after August 3, 1984. That no actual monitoring occurred after August 3, 1984 did not obligate the government to present the tapes for judicial sealing. A review of the relevant Datsun Sentra progress reports, filed by Bove to the authorizing judge, Chief Judge Perez–Gimenez, illustrates that electronic monitoring was not conducted because either the vehicle was not being operated and, therefore, the F.B.I. had no reason to activate

the surveillance or the vehicle was lost to the F.B.I. The Datsun Sentra stationwagon was used regularly by the defendant, Filiberto Ojeda–Rios. However, the vehicle remained unoccupied, parked in front of the El Monte condominium from August 4, 1984 through September 21, 1984. On September 21, 1984, the vehicle was removed, without the knowledge of the F.B.I., from the El Monte condominium. The vehicle was next observed on or about October 24, 1984, parked in front of #256 Calle 6, Barrio Guarico, Vega Baja, Puerto Rico, the suspected new residence of Filiberto Ojeda–Rios. However, on October 24, 1984 when the vehicle was again located by the F.B.I., the final thirty day extension had expired and the tapes had been sealed.

As the progress reports indicate, the F.B.I. did not cease electronic surveillance because the objectives of the surveillance had been attained. The monitoring device remained in the vehicle during this period and the F.B.I. intended to resume monitoring when the investigation indicated a need to do so, i.e., the vehicle had been located and was occupied by targeted individuals Thus, as previously noted in discussing the Levittown sealing delay,

> [B]ecause the facts of this case overall do not require us to reach the problematic issue of whether delays ought to be calculated from the expiration date of the warrant or from such earlier date as the objective of the tape is achieved, we leave the issue for another day.

*Mora* 821 F.2d at 863 n. 4.

The government was first obligated to present the cassettes for judicial sealing when the fifth extension expired on October 10, 1984. The presentment commenced the following day and was completed two days later on October 13, 1984. The Court finds that the Datsun cassettes were timely sealed and the motion to suppress is denied.

3. The Taft Street and El Cortijo Tapes

On July 27, 1984, the F.B.I. received authorization in a single order to intercept wire (telephone) and oral (microphone) communications at the Taft Street Apartment, telephone number (809) 725–1629 and at the El Cortijo residence, telephone number (809) 799–4524. Judge Perez–Gimenez authorized continued wire interception of the telephone at El Cortijo and oral interception at both Taft Street and El Cortijo on August 25, 1984. An electronic device to intercept oral communications was never installed at either the Taft Street or El Cortijo residence because the F.B.I. could not effectuate a surreptitious entry. The tapes generated from the El Cortijo and Taft Street locations were sealed, together with the Levittown and Datsun Sentra recordings, on October 13, 1984.

The government did not seek continued authorization to intercept wire communications at Taft Street when the initial order expired on August 26, 1984. The Court holds, however, that the government was not required to present the Taft Street telephone tapes for judicial sealing on August 26, 1984. Pursuant to 18 U.S.C. Sec. 2518(8)(a), the government is not obligated to present recordings, generated from surveillance at a single location, for judicial sealing until the expiration of the final extension. The term "extension" as used in the phrase 'period of the order or extensions thereof,' is to be understood in a common sense fashion as encompassing all consecutive continuations of a wiretap order, however designated, where the surveillance involves the same telephone, the same premises, the same crimes and substantially the same persons. *Vazquez*, 605 F.2d at 1278. The Court views the telephone and microphone surveillance at the Taft Street residence as inextricably connected, each being part of electronic surveillance at one facility. Applying the common sense definition of extension, as set forth above, the Court holds that the August 24, 1984 extension to continue microphone surveillance at the Taft Street residence was an extension of the electronic surveillance at Taft Street in a broader sense. Thus, the government was not required to present the Taft Street recordings, both telephone and microphone, until the expiration of the final extension which was on September 24, 1984.

■ The defendants allege that the sealing delay for the Taft Street telephone tapes is sixty-three days. This figure is arrived at by designating August 11, 1984 as the date on which the obligation to seal arose. Monitoring of the Taft Street telephone commenced on July 27, 1984. On August 11, 1984, the monitoring agents noticed that the recorder was registering activity with no incoming calls on the line. The monitors made a pretext call and a recorded message from the Puerto Rico Telephone Company informed the monitors that the number dialed was no longer in operation. In progress report two (2), dated August 16, 1984, Attorney Bove indicated to the judge that "No further calls have been monitored from this number as it appears to have been disconnected. If it is determined that the targets of this authorization obtain telephone service at apartment 1–C third floor, 172 Taft Street, Santurce, Puerto Rico, the government will promptly advise the court of any intention to monitor conversations further on such telephone line." The F.B.I. never resumed the telephone surveillance and the thirty day order expired by its terms on August 26, 1984.

The Court previously explored in its discussion of the Levittown tapes, the question, left open by the second and first circuits, concerning whether to calculate the delay from the expiration of the thirty days or from the time that the objective has been achieved because the government ceased monitoring with no intent to resume. In regard to the Taft Street Telephone surveillance, even under the latter analysis, the Court finds that the delay ought to be measured from the thirty day expiration of the microphone extension and not from the day that the actual monitoring ceased because the telephone was disconnected. The defendants, Juan Segarra–Palmer and Luz Berrios–Berrios, had not moved out of the residence, and the F.B.I. intended to reinitiate telephone surveillance as indicated in progress report (2). Thus, the Court will measure the sealing delay from the thirty day expiration of the final extension which was on September 24, 1984. *See Badalamenti*, 794 F.2d at 825

(even applying defendant's analysis that the sealing delay ought to be calculated from the date the objective was achieved if earlier than the thirty day period, the court found that the government intended to resume monitoring during the remaining period of the order if the investigation indicated the need to do so). Using the September 24, 1984 date as the date of expiration, the tapes were sealed on October 13, 1984, nineteen days after the expiration of the order.

Turning to the El Cortijo telephone tap, the government sought a timely extension on August 25, 1984 to continue the surveillance. The order expired on September 24, 1984. The tapes were sealed nineteen days later on October 13, 1984.

■ The government clearly did not seal either the El Cortijo or the Taft Street telephone tapes "immediately upon the expiration of the period of the order or extensions thereof ..." 18 U.S.C. Sec. 2518(8)(a). The Court must, therefore, determine whether the government has provided a satisfactory explanation for the delay of nineteen days in respect to El Cortijo and Taft Street. The government has cleared the first hurdle in their burden to provide a satisfactory explanation, proving by clear and convincing evidence the immaculacy of the tapes. The Court's finding of integrity of the tapes was based on an evaluation of the chain of custody and extensive expert testimony.

"Having (scaled) the initial hurdle, the government must [now] demonstrate that the delay in presenting the tapes for judicial sealing came about in good faith." *Mora*, 821 F.2d at 868. Good faith in *Mora* is characterized as having two components, that the delay not result in either benefit to the government or prejudice to the defendant. Under this standard, the Court finds that the sealing delay came about in good faith. The delay did not impede the defense in any way. In fact, the defendants in their briefs do not make any argument of prejudice. Moreover, the government derived no benefit from its failure to seal immediately. The government had no need to use the original tapes during this period.

Duplicate original tapes were available to it. The original tapes were maintained in the ELSUR room. The nineteen days were not used by the government to gain some tactical advantage. *See United States v. McGrath*, 622 F.2d 36, 42–43 (2d Cir.1980) (no prejudice to the defendants).

The length of any particular delay is a factor in determining whether the government has proffered a satisfactory explanation for the delay. The length of the delay in *Mora* was described as a subset of the questions of tampering and good faith. "[T]he longer the delay, the harder it may become to show any good faith or the absence of undue prejudice." *Id.* at 868. Although the nineteen day delay, in regard to both Taft Street and El Cortijo, is not insignificant, the Court does not deem it to be so great as to require automatic exclusion. The court in *Mora* sanctioned, after a complete analysis, a forty-one day sealing delay. That lapse was not deemed sufficient as a matter of law to merit suppression of the tapes. *Id.* at 870. In light of the government's proof that the tapes are pristine and the lack of any evidence on the record that the defendants were prejudiced or that the government benefited by the delay, the length of the sealing delays is excused.

The final factor which the Court must analyze is the cause which led to the delay. In this case, the delay was the result of Attorney Bove's misunderstanding of the phrase "order and extensions thereof" as the term appears in 18 U.S.C. Sec. 2518(8)(a). Bove was aware of the obligation to present the tapes for judicial sealing. However, since targets of this investigation changed residences and vehicles so frequently, he considered the interceptions at various locations to be interrelated and part of the same investigation. In light of Bove's perception that all orders and extensions were related, he believed the statute required sealing when there existed a hiatus in the electronic surveillance orders as a whole. "I [Bove] made the decision in October to seal the tapes because there was, apparently to us, we were basically at a dead-end at that point in the investigation. We had neither authority nor capabil-

ity—we had authority but no capability of listening anywhere ..." In other words, Bove did not believe the sealing requirement was triggered until the F.B.I. lacked the physical or legal capacity to conduct electronic surveillance in the investigation as a whole where all interceptions were related. On October 10, 1984 when the Datsun Sentra surveillance order expired, the F.B.I. lacked either the physical or legal capacity to conduct electronic surveillance at any location. Although two orders to intercept oral communications from two vehicles were outstanding at this point in the Title III investigation, the monitoring devices had not been installed in either vehicle. Consequently, when the fifth extension to conduct surveillance of the Datsun Sentra expired, Bove perceived the need to seal the tapes. This misunderstanding of the statutory sealing requirement was the sole reason for the delay. Nothing in respect to his schedule prevented him from presenting the tapes for judicial sealing before this time.

Bove erred as a matter of law in maintaining the notion that the sealing in a multi-site electronic surveillance investigation was required when the government lacked either the physical or legal capacity to conduct surveillance at any location. However, Bove testified that he read the statute prior to commencing the Title III investigation. He also had access to the following reference materials, Clifford S. Fishman's treatise entitled *Wiretapping and Eavesdropping*, a memorandum which summarized the key elements of Title III from William Corcoran, a Justice Department Trial Attorney, and materials from a Georgetown Law Journal Article. In addition, Bove spoke frequently with other attorneys within the Department of Justice but none of these attorneys indicated to him that his interpretation was in error. He spoke with Judge Perez–Gimenez one week prior to the October 13, 1984 sealing, and the judge did not comment on the delays. Thus, nothing in the record indicates that Bove intentionally ignored the applicable law or deliberately failed to seal the tapes. Rather, he believed his interpre-

tation was within the law and no evidence is on the record that even suggests he purposefully flouted the requirement or failed to carry out his duties. Rather, Attorney Bove "acted in ignorant bliss and negligently ... he was not consciously or deliberately failing to perform his duty." *Mora*, 821 F.2d at 870.

In light of the theory under which Bove was operating, that the actual sealing on October 13, 1984 was not time consuming is irrelevant. Once Bove believed he was required to present the tapes for judicial sealing, he acted diligently to complete the task. He contacted the judge one week before the date he believed was the required date. He coordinated the sealing process with Special Agent Jose Rodriquez and the ELSUR clerk, Roberto Salicrup, so that the tapes were ready for sealing one day after the expiration of the Datsun Sentra September 10, 1984 extension.

Considering all the factors, the proven immaculacy of the tapes, the length of the sealing delays for the Taft Street and El Cortio tapes, the lack of any evidence of prejudice to the defendants or tactical advantage to the government because of the sealing delay, the negligent misunderstanding by the prosecutor of his statutory duties, and the lack of any bad faith on the part of law enforcement officials in completing the presentment of the tapes for judicial sealing, the Court finds the government's explanation for the sealing delays in regard to Taft Street and El Cortijo satisfactory. The motion to suppress the Taft Street and El Cortijo telephone tapes is denied.

### B. THE JUNE 15, 1985 SEALING

#### 1. Vega Baja Residence and Telephone Tapes

The government received initial authorization to intercept oral communications at the Vega Baja residence on November 1, 1984. The order terminated on Saturday, December 1, 1984. An extension was granted on December 3, 1984. Judge Perez–Gimenez, the federal judge who supervised the Title III investigation, was off the island until Sunday, December 2, 1984.

Five additional extensions were granted; the final extension which was granted on April 30, 1985 terminated thirty days later on May 30, 1985. The tapes were sealed on June 15, 1985.

Authorization to intercept communications at two public telephones near the Vega Baja residence was initially authorized on January 18, 1985 and expired after thirty days on February 17, 1985. A subsequent order was sought twelve days later on March 1, 1985. The March 1, 1985 application was accompanied by a revised affidavit prepared by Special Agent Jose P. Rodriquez. The office of enforcement operation of the Justice Department, which reviewed all Title III applications, believed that because the investigation was lengthy, the practice of incorporating previous affidavits by reference was becoming too burdensome. Consequently, the March 1, 1985 affidavit, in support of the application for continued electronic surveillance, was revised and made more comprehensive. This revision took time; therefore, the government delayed twelve days in seeking the March 1, 1985 order. Additional extensions for continued surveillance of the Vega Baja pay telephones were authorized on March 31, 1985 and April 30, 1985. The April 30, 1985 extension expired after thirty days on May 30, 1985. The Vega Baja telephone tapes were sealed on June 15, 1985.

The first issue which confronts the Court in determining whether or not the government delayed in having the Vega Baja tapes judicially sealed is a determination of when the obligation to seal first arose. As the Court has noted, judicial sealing is required under 18 U.S.C. Sec. 2518(8)(a) "immediately at the expiration of the period of the order or extensions thereof ..." Thus, the government was not obligated to seal the Vega Baja telephone or residence tapes until the order and all extensions for each had terminated. As this Court has repeatedly stated, the term extension is to be understood "in a common sense fashion as encompassing all consecutive continuations of a wiretap order, however designated, where the surveillance involves the same telephone, the same premises, the same

crimes and substantially the same persons." *Vazquez*, 605 F.2d at 1278.

■ Using this common sense criteria, the Court finds that the December 3, 1984 order to continue oral surveillance at the Vega Baja residence was an extension of the first order despite a two day hiatus in seeking the extension. As the Court discussed in addressing the Datsun Sentra orders, "the mere fact of a gap between two orders [does] not foreclose viewing the second order as an extension ... the identity of targets, crimes, and telephones tapped not the facts of a delay between orders is determinative." *Massino*, 605 F.Supp. 1565, 1577 (S.D.N.Y.1985), *aff'd* 784 F.2d at 155 (2d Cir.1986) (court accepts district court's findings of extensions despite hiatus); *Gigante*, 538 F.2d at 508 n. 11 (court remands to determine if an order sought thirteen days later is an extension and, if so, whether the government had an explanation for the delay). Comparing the first Vega Baja order and the December 3, 1984 extension, the location and crimes under investigation were identical and the group of individuals named as targets was essentially the same. The list of target individuals was expanded slightly in the December 3, 1984 extension due to the individuals intercepted pursuant to the first order. Thus, the December 3, 1984 order was an extension order as the term has been defined.

The hiatus in this case was two days. A delay of two days in sealing the tapes would not even violate the immediacy requirement in regard to judicial sealing, and the government would have no obligation to provide a satisfactory explanation. Similarly, the Court holds that the government is under no obligation to offer an explanation for the two day hiatus in seeking a renewal of the order to conduct electronic surveillance. Nevertheless, the government has offered a reasonable explanation for the hiatus. Judge Perez–Gimenez was off the island until Sunday, December 2, 1984. Although the absence of a judge is no longer accepted as a satisfactory cause for a sealing delay, the Court accepts the judge's absence as an explanation for the two day hiatus in seeking an extension order. Judge Perez–Gimenez was familiar with the Title III investigation in this case. He had authorized all previous orders and been kept informed by progress reports of the status of the investigation. Thus, the government was justified in waiting two days, one of which was a Sunday, to seek the extension.

No further hiatus occurred in the course of the Vega Baja residence surveillance. The monitoring equipment did malfunction between February 1, 1985 and February 28, 1985. The F.B.I. was finally able to enter the premises surreptitiously on February 20, 1985 to fix the equipment. Monitoring resumed for approximately one hour until the equipment again malfunctioned. These problems were corrected and monitoring resumed without further problems on February 28, 1985. (*See* progress reports sixteen (16), dated February 21, 1985, and eighteen (18), dated March 12, 1985). The defendants do not argue and this Court does not find that the malfunction of the equipment implicates the sealing requirement.[9] *United States v. Santoro*, 647 F.Supp. 153, 163 n. 1 (E.D.N.Y.1986) (a machine malfunction which caused interceptions to cease did not implicate the sealing requirement). Consequently, the obligation to seal the Vega Baja residence tapes did not arise until the May 30, 1985 termination of the final extension. The tapes were not sealed until sixteen days later on June 15, 1985.

■ Turning to the Vega Baja public telephone surveillance, the Court looks initially at the twelve day hiatus between the expiration of the first order on February

---

**9.** The fact that the Vega Baja tapes were not sealed between February 17, 1985 and February 28, 1985, when the F.B.I. lacked the legal and physical capacity to conduct surveillance at any location does not discredit Bove's testimony in regard to the October 13, 1984 sealing for two reasons: 1). Bove testified that he viewed the investigation differently in February, 1985 than in October, 1984, and 2). Bove differentiated between a situation where the F.B.I. lacked physical capacity because a monitoring device had never been installed and one where the monitoring device malfunctioned temporarily.

17, 1985 and the subsequent March 1, 1985 order. The first order expired on February 17, 1985. Twelve days later, on March 1, 1985, the government sought an extension to continue to intercept telephone conversations. The March 1, 1985 order covered the same telephones, concerned the same crimes, and targeted the same individuals as the January 18, 1985 initial order. Thus, it was an extension of the first as the term has been defined in *Vazquez*, 605 F.2d at 1278.

However, the second circuit in *Gigante*, 538 F.2d at 508 n. 11 instructed the district court when confronted with this issue to ask not merely whether a subsequent order is an extension but also whether the government has offered a satisfactory explanation for a delay in seeking an extension. In the present case, the Court does not find the government's explanation for the delay satisfactory. As noted, the Justice Department required that the F.B.I. revise its affidavit because of the length and complexity of the Title III investigation and resulting cumbersome process of incorporating previous affidavits by reference. The Court has compared the January 18, 1985 and the March 1, 1985 affidavits and finds that the changes necessary to complete this task were not that substantial. The government ought to have completed the task in a more expeditous manner. Thus, the Court does not accept the government's explanation for the twelve day delay and will regard the January 18, 1985 and the March 1, 1985 orders as separate and distinct; in other words, the Court does not view the March 1, 1985 order as an extension of the January 18, 1985 order.

Under this rationale, the delay in sealing the telephone tapes generated from the January 18, 1985 order was one-hundred and eighteen days (118). The Court finds the delay to be excessive as a matter of law and suppresses all tape generated pursuant to the January 18, 1985 order to conduct wire surveillance of the Vega Baja public telephones. (*See* III, A, 2–delay of eighty-two days in sealing the Levittown tapes is excessive as a matter of law).

The Court will view the March 1, 1985 order as a separate order from, and not an extension of, the January 18, 1985 order. The government sought and received timely extensions of the March 1, 1985 order on March 31, 1985 and on April 30, 1985 to continue the telephone surveillance. This final extension expired on May 30, 1985. The tapes were not, however, sealed until June 15, 1985.

The Court is faced with a sixteen day delay in sealing both the Vega Baja residence and pay telephones recordings. The government bears the burden in this case to present a satisfactory explanation for the delay. As previously noted, the threshhold question in evaluating whether the government has provided a satisfactory explanation is whether the government has proven the integrity of the tapes by clear and convincing evidence. The Court has addressed the issue in great detail and finds that the immaculacy of the tapes has been proven by the government.

The next factor to be considered is whether the delay came about in good faith, i.e., whether the delay resulted in prejudice to the defendants or benefit to the government. The record is simply bare of any evidence of prejudice to the defendants in this case because of the sixteen day sealing delay. All Title III tape recordings made in connection with this case were disclosed to the defendants shortly after their arrests in August 30, 1985. In addition, the government did not take advantage of the sixteen day delay in sealing the tapes either to tamper with the tapes or in any way use the tapes to gain some advantage in a more general sense.

The final factor which the Court must consider in reviewing whether or not the government has satisfied its burden of presenting a satisfactory explanation for the delay is the cause for the delay. Attorney Bove was responsible for presenting the tapes for judicial sealing on June 15, 1985. On May 29, 1985, one day prior to the expiration of the final extension of both the residence and telephone taps, Bove addressed a memorandum to Special Agent in Charge Richard Held with an attention to

the Supervisory Special Agent, George Clow. The memorandum stated, "As you know our authorization for Vega Baja location expires on May 30, 1985. Since a decision has been made not to seek renewal of the order at this time, we again will be in the situation where we should seal all existing tapes of intercepted conversations pursuant to the provision of 18 U.S.C. Sec. 2518(8)(a) as we did on October 11, 1984. Advise me as soon as the tapes are ready for sealing so that we can coordinate with the Judge's schedule." (D.X. # 2386)

Based on this memorandum and the testimony of Attorney Bove, the Court finds that Bove knew that the government was required to seal the tapes at the conclusion of the final Vega Baja extensions and was ready to effectuate the presentation of the tapes for judicial sealing. Nothing in Bove's schedule prevented him from presenting the tapes for judicial sealing immediately at the expiration of the extensions on May 30, 1985. Thus, the government's reliance on *Rodriquez*, 786 F.2d at 472 wherein the prosecutor's schedule and understanding of the Title III sealing requirements led to the delay is misplaced. Rather, the Court finds that it was a misunderstanding and lack of communication between Supervising Attorney Bove and the F.B.I. which led to the delay.

Special Agent Jose Rodriquez who acted as the liaison between the prosecutor and the ELSUR clerk for the October 13, 1984 sealing left the island during the first week of June, 1985. Special Agent Rodriquez delegated the coordination task to Special Agent Marlene Hunter, and Special Agent Hunter testified that Rodriquez told her to wait for the prosecutor's call to initiate the sealing process. Special Agent Hunter testified that she was aware of the sealing requirement but not aware of the need for expedience in completing the task. Thus, she waited for the prosecutor to contact her.

Bove testified that it was his understanding that the F.B.I. were extremely busy during this time and could not effectuate the sealing presentation. Bove was partially correct in his belief. Agent Hunter testified that she was involved in preparing the search warrant affidavit for the numerous physical searches conducted on August 30, 1985, (*See* Court's Ruling dated September 18, 1987 on the issues of probable cause and particularity of the physical search warrants), reviewing physical surveillance logs, and preparing the affidavits to accompany the applications to conduct electronic surveillance of the El Centro Condominium and a 1980 Datsun Hatchback. However, both Marlene Hunter and Supervisory Special Agent George Clow testified that there was no personnel shortage and that, despite the busy schedule, they could have coordinated the sealing, if they were aware of the need for expedience.

After one week had passed, Bove did contact Hunter by telephone to initiate the sealing process by inquiring as to the number of Vega Baja tapes that needed to be sealed. Within one day, Agent Hunter contacted Salicrup for the information and communicated the number to Bove. Bove contacted the judge on Wednesday, June 12, 1985 or Thursday, June 13, 1985 to arrange to have the tapes sealed. Judge Perez–Gimenez was on trial during this period but agreed to seal the tapes on Saturday, June 15, 1985.

The unavailability of the issuing judge, Judge Perez–Gimenez, until June 15, 1985 is no excuse for failing to seal the tapes. Case law has established that the issuing judge need not be the judge who seals the tapes. *United States v. Poeta*, 455 F.2d 117, 122 (2d Cir.1972), *cert. denied*, 406 U.S. 498, 92 S.Ct. 2041, 32 L.Ed. 2d 337 (1972); *Mora*, 623 F.Supp. at 365 (no evidence that judge not available and no reason another judge could not seal the tapes); *Vazquez*, 605 F.2d at 1280 n. 5. Thus, the misunderstanding and the lack of communication between the prosecutor and the F.B.I. stand as the central reasons for the delay. The Court finds that the misunderstanding came about in good faith. The prosecutor was not unjustified in his belief that the F.B.I. were extremely busy during this time, and Special Agent Hunter was not unjustified in following instructions

and waiting for the prosecutor to call. The Court finds no evidence of intentional delay on the part of either the F.B.I. or the prosecutor. Moreover, the Court does not find that the prosecutor was

> consciously or deliberately failing to perform his duty ... [the Court does] not condone or pardon such conduct, but [the Court] cannot condemn it as severely as if a purposeful attempt to evade the law or unfairly to pillory a suspect had transpired. Putting the worst face on things, the delays in this instance came about by honest mistake, negligently rather than intentionally.

*Mora*, 821 F.2d at 870.

In summary, the Court finds no evidence that Bove's conduct "bespoke any bad faith." *Rodriquez* 786 F.2d at 478. The government neither sought nor gained any tactical advantage by the delay and the defendants were not, in any way, prejudiced by the delay. The government has proven by clear and convincing evidence the integrity of the Vega Baja residence and telephone tapes. The misunderstanding between the prosecutor and the F.B.I. concerning who would initiate the sealing process, during a time when the F.B.I. were preoccupied with vital elements of the investigation does not, in the absence of other factors, merit suppression of the Vega Baja tapes.

> For these reasons, and in the absence of any indication that the [prosecutor] was motivated by impermissible factors, the sixteen day delay was not unreasonable ... This determination stands even though the [prosecutor] presumably was aware of the requirement under [Federal] law that the tapes be immediately sealed, and even though perhaps earlier arrangements should have been made concerning the judicial sealing of the tapes.

*United States v. Lilla*, 534 F.Supp. 1247, 1272 (N.D.N.Y.1982).

Accordingly, the motion to suppress the Vega Baja residence tapes and the Vega Baja telephone tapes made pursuant to the March 1, 1985 order, and two subsequent extensions, is denied. The Court suppresses the Vega Baja telephone tapes made pursuant to the January 18, 1985 order.

### C. THE SEPTEMBER 14, 1985 SEALING

#### 1. El Centro Tapes

The final electronic surveillance conducted in this case was oral surveillance at the El Centro condominium. The El Centro condominium is alleged by the government to be a safehouse for Los Macheteros. A safehouse has been defined as an apartment, office, or home utilized by terrorists to meet, plan activities, store weapons, documents, and explosives, and hide from law enforcement officials.

Authority to intercept oral communications at El Centro was given on June 27, 1985. Two extensions were later authorized by Judge Perez–Gimenez on July 24, 1985 and August 23, 1985. As with all electronic surveillance orders in this case, the final El Centro extension contained a provision which authorized the surveillance to

> continue until communications are intercepted which reveal the manner in which Orlando Gonzalez–Claudio, Filiberto Ojeda–Rios, Luis Colon–Osorio, Roberto Maldonado, Ruben Ramon Acosta, Sylvia Mulling Cowart, Blanca Iris Serrano–Serrano and others yet unknown participated in the above described offenses and which reveal the identities of the confederates, their places of operation, and the nature of the conspiracy involved therein or for a period of thirty (30) days from the date of this order, whichever is earlier.

The extension is written in the alternative; authorization is granted for thirty days, which in this case was September 22, 1985, or until the objectives of the surveillance are achieved. In determining whether or not the government delayed in presenting the El Centro tapes for judicial sealing, the Court must address the issue left unresolved by both the first and second circuits and which the Court previously had no need to resolve (See III,A,1,2,and 3). On August 30, 1985, twenty-three days before the order expired by a strict numerical

computation, the F.B.I. executed a warrant to search the El Centro condominium. The F.B.I. conducted numerous other physical searches on this day in conjunction with the arrests in Puerto Rico of eleven of the defendants in this case. El Centro progress report ten (10), dated September 4, 1985, from AUSA Roberto Moreno to Judge Perez–Gimenez indicates that electronic surveillance at El Centro ceased on August 30, 1985 because of the physical search. "The interception of these premises terminated on August 30, 1985 due to the execution of a search warrant on this location." The monitoring logs indicate that no monitoring was attempted after August 29, 1985, and, unlike the situation at Taft Street, the F.B.I. did not note in any progress report its intent to reinitiate interception if the investigation revealed the need to do so. In fact, the monitoring device was removed by the F.B.I. in the course of the August 30, 1985 search. (See, affidavit of Special Agent Jose P. Rodriquez, Def.Ex. # 2377). Thus, based on the facts before this Court, no intention existed nor did the F.B.I. retain the capability to continue interception after August 30, 1985 at the El Centro condominium.

The government is correct when it argues that three defendants in this case, Avelino Gonzalez–Claudio, Norberto Gonzalez–Claudio, and Victor Manuel Gerena, were not apprehended on August 30, 1985 and continue to be fugitives. However, this fact is irrelevant to a determination of when the extension to conduct electronic surveillance at the El Centro terminated for sealing purposes. The three individuals were not even named as targets in the El Centro order. Thus, the objectives of the wiretap were achieved on August 30, 1985 and the authorization terminated by its alternative terms on that date. The question, therefore, is whether this sort of termination triggers the requirement that the tapes be presented "immediately" for judicial sealing.

The second circuit in *Badalamenti*, 794 F.2d at 825, upheld the district court's finding that the mere cessation of electronic surveillance, prior to the expiration of the thirty day period, does not, without more, trigger the sealing requirement. The issue, however, is whether the sealing requirement is triggered when the objectives of the surveillance, in light of the facts of a particular case, are reached if that period occurs before the thirty days has run. Judge Lasker in *United States v. Ricco*, 421 F.Supp. 401 (S.D.N.Y.1976), *aff'd*, 566 F.2d 433 (2d Cir.1977), *cert. denied*, 436 U.S. 926, 98 S.Ct. 2819, 56 L.Ed.2d 768 (1978) and Judge Kram in *United States v. Morgan*, 646 F.Supp. 1038, 1040 n. 3 (S.D.N.Y.1986) calculated sealing delays from the date of the arrests of the targets when that date was earlier than the thirty day period. In *Morgan*, the thirty day order by numerical calculation expired on March 15, 1983. Actual surveillance ceased on February 23, 1983, when the targets were arrested. The tapes were sealed on March 2, 1983, eight days after the arrests and conclusion of the wiretap and thirteen days before the thirty day period ran. Both the prosecution and the defense agreed, and the court accepted, that the delay in sealing would be calculated from the date of the arrests. Thus, the Morgan court found an eight day sealing delay. "The wiretap terminated when Morgan was arrested. Thus, there is no question that its objective was achieved on February 23, 1983, and that the wiretap would not recommence. The government does not ask that the delay be calculated from the expiration date of the order." *Accord Mora*, 821 F.2d at 864 (use of the second warrant began on May 7, 1985 and ended on May 16, 1985 with the arrest of the suspects. The United States acknowledges that, inasmuch as this eavesdropping culminated in the arrest and apprehension of the suspects on May 16, 1985, the span of the sealing delay must be calculated from that date forward ...).

This theory comports with the legislative history of Title III. "The period of authorized interception is intended to begin when the interception—in fact—begins and terminate when the interception—in fact—terminates. This will be a question of fact in each case." 1968 U.S.Code Cong. & Admin. News, 2112, 2192. In addition, under 18 U.S.C. Sec. 2518(5) "no order entered

under this section may authorize or approve the interception of any wire, oral or electronic communication for any period longer than is necessary to achieve the objective of the authorization, nor in any event longer than thirty (30) days."

■ As cited above, in the final El Centro extension, authority to intercept is not conferred for simply a fixed number of days but rather is written in terms of thirty days or until certain communications are intercepted, i.e., the objectives are achieved. Thus, where the F.B.I. achieves its objectives, as evidenced by the arrest of the defendants, actually abandons the electronic surveillance operation, and removes the electronic device from the premises before the thirty day period has run, the order has expired by its own terms. Sealing under 18 U.S.C. Sec. 2518(8)(a) is required "immediately at the expiration of the period of the order or extensions thereof." Thus, the Court holds that the sealing delay ought to be calculated from the day of the arrests when the monitoring device was removed and no further intent to conduct electronic surveillance existed. The Court recognizes that the issue has not been resolved by either the first or second circuit and that this holding places a greater burden on the prosecutor to maintain oversight of an electronic surveillance operation in order to determine when tapes ought to be presented for judicial sealing. However, in light of the objectives behind the sealing requirement, the Court deems such oversight necessary.

> The purpose [of the sealing requirement] is to place the custody and disposition of evidence obtained through the tapes as much as possible under control and supervision of the court and thereby avoid the potential for tampering or for inadvertent abuse of the evidence. This being the purpose, it would not be rational to require the immediate sealing of the wiretap when the investigation continued up to the last of the thirty day order but to permit sealing to be postponed until the end of the thirty days where the wiretap investigation itself ends say on

the second or third day of the thirty day period.

*Ricco*, 421 F.Supp. at 467.

■ Using the August 30, 1985 date as the day from which the obligation to present the tapes for judicial sealing arose, the delay in sealing the El Centro tapes is fourteen days. Although the delay "is not miniscule, neither [is] it of *Gigante* proportions." *Vazquez*, 605 F.2d at 1279–1280 (delays from seven and thirteen days). The government has, however, offered a satisfactory explanation for the delay, an explanation which addresses the integrity of the tapes, the cause for the delay and absence of any showing of prejudice to the defendant or benefit to the government because of the delay.

The government has shown by clear and convincing evidence the immaculacy of the tapes, including a proper chain of custody. In addition, the record is devoid of any evidence that the government benefited from, or that the defendants were prejudiced by, the delay. Therefore, under the terminology set forth in *Mora*, the delay came about in good faith.

Assistant United States Attorney in Puerto Rico, Roberto Moreno, was responsible for presenting the El Centro tapes to the judge for sealing. Attorney Bove had left the island on July 29, 1985. Attorney Moreno testified that he believed he had until the termination of the thirty days of the final extension, September 22, 1985, to present the tapes for judicial sealing. In other words, Moreno believed that the sealing requirement was triggered at the end of the thirty days and not when the surveillance ceased because the objectives of the investigation were attained. He prepared the application and motion to seal on September 13, 1985, and the tapes were judicially sealed September 14, 1985, eight days earlier than Moreno believed was required.

Moreno acted diligently in taking such steps to seal the tapes in light of his other responsibilities at this time. Eleven defendants were arrested in Puerto Rico on August 30, 1985 pursuant to an indictment handed down in Hartford, Connecticut.

Numerous physical searches were also conducted on this date. AUSA Moreno was in charge of reviewing the search warrants which were all approximately fifty pages in length and, after August 30, 1985, handled all the hearings under F.R.Cr.P. 40, commitment to another district, as well as all motions filed by any defendant. Special Agent Marlene Hunter described the situation in Puerto Rico at this time as "almost chaotic."

Given the uncertainty of the law concerning when the obligation to present tapes for judicial sealing arises in the situation confronted by AUSA Moreno, together with the responsibilities of AUSA Moreno at the time, the Court finds no intent to flout the sealing requirement. AUSA Moreno acted diligently under the circumstances. *See Poeta,* 455 F.2d at 122 (court accepts as a satisfactory cause for the delay, where no suggestion of bad faith by the government or prejudice to the defendant, the prosecutor's erroneous belief that the issuing judge had to seal the tapes). *Rodriquez,* 786 F.2d at 478 (court excused a fourteen day delay caused by prosecutor's schedule and erroneous belief a final report had to accompany the tapes at the time of sealing).

The Court finds that the government has carried its burden to show a satisfactory reason for the fourteen day delay and the motion to suppress the El Centro tapes is denied.

## CONCLUSION

For the foregoing reasons, the defendants' motion to suppress the Title III recordings for failure to comply with 18 U.S. C. Sec. 2518(8)(a) is granted in part and denied in part. The Court orders only the suppression of the Levittown tapes and the tapes generated pursuant to the January 18, 1985 order to conduct wire surveillance of two public telephones at Vega Baja.[10]

SO ORDERED.

## APPENDIX A

| LOCATION | EXPIRATION DATE By Expiration of 30-day Order or Final Extension | By Cessation of Actual Monitoring | DATE SEALED | By 30-day Order | By Actual Cessation |
|---|---|---|---|---|---|
| Levittown Apt. & 3 Public Telephones | July 23, 1984 | July 9, 1984 | October 13, 1984 | 82 days | 96 days |
| Datson Sentra | October 10, 1984 | N.A. | October 13, 1984 | 3 days | — |
| Taft Street & El Cortijo Residences Telephones | September 25, 1984 | N.A. | October 13, 1984 | 19 days | — |
| Vega Baja Residence | May 30, 1985 | N.A. | June 15, 1985 | 16 days | — |
| Vega Baja Telephones (January 18, 1985 Order) | February 17, 1985 | N.A. | June 15, 1985 | 118 days | — |
| Vega Baja Telephones (March 1, 1985 Order) | May 30, 1985 | N.A. | June 15, 1985 | 16 days | — |

10. The Levittown and January 18, 1985 Vega Baja telephone interceptions, although illegally obtained, can still be used for impeachment purposes. *See United States v. Winter,* 663 F.2d 1120, 1154 (1st Cir.1981), *citing, United States v. Havens,* 446 U.S. 620, 100 S.Ct. 1912, 64 L.Ed.2d 559 (1980).